**UNITED STATES of America, Plaintiff,**

v.

**PANHANDLE EASTERN CORP., Panhandle Eastern Pipe Line Co., Trunkline Gas Co., Trunkline LNG Co., General Dynamics Corp., Moore McCormack Resources, Inc., Moore McCormack LNG Transport, Inc., Morgas, Inc., Pantheon, Inc., Pelmar Co., and Lachmar, a Delaware General Partnership, Defendants.**

Civ. A. No. 87–190–JLL.

United States District Court,
D. Delaware.

Feb. 23, 1988.

William C. Carpenter, Jr., U.S. Atty., Wilmington, Del., Robert M. Hollis and Grego-

ry A. Harrison, Civil Div., Dept. of Justice, Washington, D.C. (Robert J. Patton, Jr., Maritime Admin., Washington, D.C., of counsel), for plaintiff.

Lawrence A. Hamermesh and Vicki Hagel of Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Michael Joseph, Thomas M. Dyer, E. Alex Blanton, Marie Louise Hagen, and Brett M. Esber of Dyer, Ellis, Joseph & Mills, Washington, D.C., of counsel), for defendants Panhandle Eastern Corp., Panhandle Eastern Pipe Line Co., Trunkline Gas Co., Trunkline LNG Co., Morgas, Inc., Pantheon, Inc., Pelmar Co., and Lachmar.

Richard A. Levine of Young, Conaway, Stargatt & Taylor, Wilmington, Del. (Richard T. Franch, Robert T. Markowski and Robert R. Stauffer of Jenner & Block, Chicago, Ill., of counsel), for defendant Gen. Dynamics Corp.

Thomas Herlihy III of Herlihy & Wier, Wilmington, Del. (Ralph J. Savarese, Michael J. Hurley, and Thomas Horton of Howrey & Simon, Washington, D.C., of counsel), for defendants Moore McCormack Resources, Inc., and Moore McCormack LNG Transport, Inc.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

## I. INTRODUCTION

The matter now before the Court stems from a civil action brought by the United States, on behalf of the Maritime Administration ("Marad"), demanding monetary, declaratory and equitable relief from Panhandle Eastern Corporation ("PEC") and its affiliates,[1] General Dynamics Corp. ("General Dynamics"), Moore McCormack Resources, Inc. ("Moore McCormack"), and Moore McCormack LNG Transport, Inc. ("MMLT"). By its action the Government is attempting to protect its interests as the guarantor of certain ship construction financing bonds, which were issued pursuant to Title XI of the Merchant Marine Act of 1936, 46 U.S.C. §§ 1271–1279b (1982).

Presently before the Court is the Motion of Defendants Panhandle Eastern Corporation, Panhandle Eastern Pipe Line Co., Trunkline Gas Co., and Trunkline LNG Co. for Partial Summary Judgment ("motion"). (Docket Item ["D.I."] 58.) Specifically, the named defendants move for summary judgment on Counts I–V and Counts XXII–XXIV of plaintiff's complaint. Because the Court finds PEC's arguments in support of its motion unpersuasive, the motion will be denied.

## II. FACTS

In September, 1975, PEPL and Sonatrach, the Algerian National Oil and Gas Company, entered into a contract for the sale and purchase of liquefied natural gas ("LNG") for importation into the United States ("Sonatrach Contract"). Four months later, PEPL assigned its interest in the Sonatrach Contract to TLC, which at the time was an indirect, wholly-owned subsidiary of PEPL.[2]

In 1976, PEPL, General Dynamics and Moore McCormack (along with MMLT, a Moore McCormack subsidiary) formed the wholly-owned subsidiaries, Pelmar, Pantheon, and Morgas, respectively. In May, 1976, these newly formed subsidiaries themselves formed the new company, Lachmar, when they entered into the Lachmar Partnership Agreement. (D.I. 1A, Exhibit A.) The Lachmar Partnership Agreement distributed the partnership assets of Lach-

---

1. PEC's present motion is made on behalf of itself and its subsidiaries: Panhandle Eastern Pipe Line Co. ("PEPL"), Trunkline Gas Co. ("Trunkline"), and Trunkline LNG Co. ("TLC"). Although not specifically named in its motion, PEC is also presently the parent company of defendants Morgas, Inc. ("Morgas"), Pantheon, Inc. ("Pantheon"), Pelmar Co. ("Pelmar"), and Lachmar ("Lachmar").

Defendants General Dynamics, Moore McCormack, and MMLT have joined plaintiff in opposing the present motion.

2. Until 1981, TLC was a wholly-owned subsidiary of Trunkline, which in turn was a wholly-owned subsidiary of PEPL. Pelmar was also a wholly-owned subsidiary of PEPL.

In the first half of 1981, PEC, a holding company, was formed as the corporate parent. TLC, PEPL, and Pelmar then became direct wholly-owned subsidiaries of PEC. Trunkline remained a wholly-owned subsidiary of PEPL.

mar as follows: Pelmar received a 40% share; Pantheon also received a 40% share; and Morgas received a 20% share. (*Id.* at 3.)

Upon its formation, Lachmar entered into a Transportation Agreement with TLC ("Transportation Agreement"). (D.I. 1A, Exhibit B.) Under the terms of the Transportation Agreement, Lachmar agreed to provide two tankers for the transportation of LNG from Algeria to the United States. (*Id.*, Article II.) In return, TLC agreed to make specified minimum annual payments to Lachmar, whether or not the shipments of LNG were actually made.

At this time, Trunkline gave its assurance (*see* Trunkline Agreement) (D.I. 1A, Exhibit C) that it would "take whatever actions [were] necessary to enable [TLC], [Trunkline's] wholly-owned subsidiary, to perform all of its obligations under the Transportation Agreement, including the payment of all amounts due thereunder...." (*Id.* at 1.)

The cost to construct Lachmar's two LNG tankers was approximately $377.8 million. The construction costs were covered in large part by equity contributions from Lachmar's partners and by $197.5 million of ship financing bonds which were issued by Lachmar and guaranteed by Marad pursuant to Title XI of the Merchant Marine Act of 1936, 46 U.S.C. §§ 1271–1279b. In return for its guarantee of these bonds, Marad required Lachmar to enter into a security agreement ("Security Agreement"). (D.I. 1A, Exhibit D.) Under the terms of the Security Agreement, Marad took first and second mortgages on the two LNG tankers, as well as a security interest in Lachmar's "right, title and interest" in the Transportation Agreement between Lachmar and TLC, including all payments due thereunder. (*Id.* at 2, 3.) The Security Agreement also provided that "the Transportation Agreement [would] not be amended, modified or varied without the prior written consent of the Secretary and that no termination of the Transportation Agreement [would] be effective pursuant to the provisions thereof ... without the

consent of the Secretary." (*Id.*, Special Provisions, Article Sixth, subsection (n), at 14.) At this time, TLC signed an agreement in which it consented to this assignment to Marad of Lachmar's rights under the Transportation Agreement. (D.I. 1A, Exhibit E.) Within its consent, TLC also agreed that: "(a) The Transportation Agreement [would] not be amended, modified or varied without the prior written consent of the Secretary; and (b) No termination of the Transportation Agreement pursuant to the provisions thereof ... [would] be effective without the consent of the Secretary." (*Id.*, ¶ 4, at 1–2.) Similarly, Trunkline consented to the assignment to Marad of Lachmar's rights under the Trunkline Agreement, and likewise agreed not to amend, modify, vary or terminate the Trunkline Agreement without the prior written consent of the Secretary. (D.I. 1A, Exhibit F.)

The two LNG tankers were eventually constructed and delivered to Lachmar in 1980. Pursuant to the terms of the Transportation Agreement and by agreement among the parties, performance of obligations under the Transportation Agreement commenced on December 1, 1982. By December, 1983, the Lachmar LNG tankers had completed several trips between Algeria and the United States, and Lachmar had submitted its first invoice to TLC under the Transportation Agreement. TLC and Trunkline then informed Lachmar in writing that they were suspending their performance under the Transportation Agreement, the Trunkline Agreement, and the Sonatrach Contract. (*See* D.I. 1A, Exhibits H, I, and J.) TLC claimed, among other things, that "adverse economic and market conditions ... [had] caused the purposes of [the various] agreements to be frustrated" and that "continued performance of such agreements [was] commercially senseless." (D.I. 1A, Exhibit H.)

After being so informed, Lachmar responded by serving a demand for arbitration in New York, New York, on TLC, Trunkline, and PEC ("Lachmar Arbitra-

tion").[3] Sonatrach also initiated arbitration proceedings in Geneva, Switzerland, against PEC under the Sonatrach Contract ("Sonatrach Arbitration"). The Lachmar Arbitration, in which Lachmar had demanded damages in excess of $860 million, was stayed temporarily to await an outcome in the Sonatrach Arbitration. In June, 1985, counsel for PEC delivered to Marad the outline of a proposed settlement to the Lachmar Arbitration, under which PEC would buy out the Lachmar partnership shares owned by General Dynamics and Moore McCormack. Marad responded directly to TLC by letter in September, 1985, and informed it that the proposed sale could not occur without Marad's consent. (D.I. 1A, Exhibit K.) By letters dated November 20, 1985, Marad individually informed Lachmar, TLC, Pelmar, Pantheon, and Morgas that it could not "support the stock transaction as proposed unless all the parties [took] affirmative and effective steps to reduce the Government's risk." (D.I. 1A, Exhibit M.) The letters further reiterated that "Marad's consent [was] required and [would] not be given to any proposed stock transfer or any action or transaction designed to terminate the arbitration without full protection of the Government's interests." (Id.)

Notwithstanding these warnings, on June 12, 1986, PEC, General Dynamics (the parent company of Pantheon), and Moore McCormack (the parent company of Morgas) came to an agreement in principle on the purchase of Lachmar. (See D.I. 1A, Exhibit N.) On July 20, 1986, PEC purchased all the shares of Pantheon stock from General Dynamics for $90 million, and all the shares of Morgas stock from Moore McCormack and MMLT for $45 million. (See D.I. 1A, Exhibits P and Q.) Simultaneously, on July 20, 1986, Lachmar and TLC signed a stipulation dismissing the Lachmar Arbitration with prejudice. (D.I. 1A, Exhibit O.) At the same time, they submitted to the arbitration panel an "Award on Consent" which stated that "[a]t the request of all parties, this arbitration is hereby dismissed with prejudice and without costs to any party as against any other." (Id.) The following day PEC issued a press release which read in part: "BUYOUT OF LACHMAR ENDS ARBITRATION." (D.I. 1A, Exhibit R at 1.)

In August, 1986, Marad responded to PEC's purchase of Lachmar and the concomitant dismissal of the Lachmar Arbitration with a written protest directed to PEC, General Dynamics, and Moore McCormack. (D.I. 1A, Exhibit S.) Any potential for a non-litigated solution was removed as of March, 1987. On March 10, 1987, the President of TLC delivered a letter to Marad indicating uncertainty as to how long TLC would arrange for funding to enable Lachmar to service its outstanding Title XI debt.[4] (See D.I. 1A, Exhibit U.) Within one month of receipt of that letter, the United States brought the action against PEC and the other named defendants from which the present motion arises.

## III. ANALYSIS

PEC has moved for partial summary judgment as to Counts I–V and Counts

---

**3.** In 1984, Lachmar initiated litigation in the United States District Court for the Southern District of New York to compel TLC to arbitrate. TLC responded by arguing that the Lachmar Arbitration could not proceed unless Marad was joined as a party. The district court ruled otherwise and held that Marad was not a necessary party to the arbitration. TLC appealed, but in *Lachmar v. Trunkline LNG Co.*, 753 F.Supp. 8 (2d Cir.1985), the Second Circuit Court of Appeals affirmed the district court's ruling. In previously denying defendants' Motion to Stay Pending Arbitration (D.I. 31, as amended by D.I. 46 at 1–2), this Court also ruled that Marad has no obligation to arbitrate under the Transportation Agreement. (*See* Order Denying Stay of Judicial Proceedings Pending Arbitration, D.I. 64; Memorandum Opinion of October 27, 1987, D.I. 70.) 672 F.Supp. 149 (D.Del.1987), *appeal dismissed*, 842 F.2d 685 (3d Cir.1988).

**4.** At oral argument on this motion held on February 10, 1988, counsel for PEC informed this Court that PEC had ceased to fund Lachmar as to one of the ships, and the bonds secured by that ship had gone into default. Counsel for the Government confirmed this fact, and indicated that the following day the Government would be wire-transferring $69 million to the trustee of the bondholders in order to honor its guarantee of those bonds.

XXII–XXIV of plaintiff's complaint.[5] (*See* D.I. 58.) A court may render summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The purpose of this rule is to eliminate the excess expense and delay which are attendant to an unnecessary trial. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977) (citing *Tomalewski v. State Farm Life Ins. Co.*, 494 F.2d 882, 884 (3d Cir.1974); *Mintz v. Mathers Fund, Inc.*, 463 F.2d 495, 498 (7th Cir. 1972)). When the nonmoving party will bear the burden of persuasion at trial, as the Government will here, the party moving for summary judgment "may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial." *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 897 (3d Cir.) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert. dismissed*, —— U.S. ——, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Based on the foregoing standards, the Court finds summary judgment to be inappropriate as to the named counts of plaintiff's complaint, and will deny PEC's motion.

PEC presents two arguments in support of its motion. The first argument, which essentially contends that the Transportation Agreement may not serve as the basis for Marad's claim, requires the acceptance of several propositions. First, PEC argues that under principles of contract law, TLC's "anticipatory breach" of the Transportation Agreement and Lachmar's prosecution of its claim in the New York arbitration proceedings against TLC for total breach in effect terminated that agreement by relieving both parties of future performance obligations. (*See* Brief in Support of Motion for Partial Summary Judgment, D.I. 59 at 2, 19–21.) Secondly, the argument posits that inasmuch as the Transportation Agreement constituted collateral in which Marad had been granted a security interest, the termination of that agreement constituted a "disposition" of said collateral within the meaning of the Uniform Commercial Code ("U.C.C."). (D.I. 59 at 22–24.) U.C.C. Section 9–306(2) provides in pertinent part:

> Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof *unless the disposition was authorized by the secured party* in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

U.C.C. § 9–306(2) (emphasis supplied). Obviously, as the final point of its argument, PEC contends that Marad did indeed authorize this "disposition" and thereby terminated its security interest in the Transportation Agreement. (D.I. 59 at 22–24.) Consequently, PEC concludes that those aspects of Marad's claim founded solely in the Transportation Agreement are baseless. (*Id.*)

In the alternative, PEC argues that even if the termination of the Transportation Agreement did not constitute a "disposition" within the meaning of the U.C.C., or even if Marad did not authorize the termination, Lachmar's claim of total breach nevertheless brought the agreement to an end. (*Id.* at 23 & n. 13.) PEC posits that the agreement therefore ceased to exist as collateral, and was in effect "destroyed,"

---

**5.** The named counts are comprised of the following claims: Count I—statutory action for breach of the Transportation and Trunkline Agreements; Count II—contractual action for breach of the Transportation and Trunkline Agreements; Count III—contractual breach of assignee's rights under the assigned Transportation and Trunkline Agreements; Count IV—con- tractual breaches of TLC and Trunkline consents; Count V—statutory action for breaches of the TLC and Trunkline consents; Count XXII— tortious interference with TLC Consent; Count XXIII—tortious interference with Trunkline Consent; Count XXIV—tortious impairment of collateral by suspension of performance. (*See* D.I. 1.)

thus rendering it impossible for a security interest to continue in it.[6] (*Id.*)

■ Stated simply, the question presented by PEC's first argument is whether Lachmar's arbitration action for breach of the Transportation Agreement has voided that agreement for purposes of Marad's security interest in it. The Court answers this question in the negative.

It is noteworthy that until recently PEC had held the position that the Transportation Agreement remained in effect. Nothing in either the stipulation dismissing the Lachmar Arbitration or in the Award on Consent purported to terminate the Transportation Agreement. (*See* D.I. 1A, Exhibit O.) Furthermore, in two separate Form 10–Q reports, filed with the Securities and Exchange Commission on August 14, 1986 and November 19, 1986, respectively, PEC reported that "[t]he Lachmar transportation agreement and the related agreement of Trunkline, which have been assigned to the U.S. Government as security for the indebtedness of Lachmar as to its U.S. Government Guaranteed Ship Financing Bonds ... remain in effect." (Brief of General Dynamics Corporation in Opposition to PEC Defendants' Motion for Partial Summary Judgment, Exhibits 11 and 12; D.I. 73, Exhibit 11 at 10; Exhibit 12 at 11.) The following month, in a letter dated December 10, 1986, one of PEC's attorneys again acknowledged that the Transportation Agreement remained in effect. (*See id.,* Exhibit 13.) Finally, TLC's March 10, 1987 letter to Marad (D.I. 1A, Exhibit U), indicated that TLC believed that the Transportation Agreement remained in effect. The letter stated in part:

*Although not obligated to do so under the Transportation Agreement or otherwise, we intend until further notice to arrange for funding sufficient to enable Lachmar to service the outstanding Title XI debt secured by these vessels. How long we will continue to do so will depend upon, among other things, further developments relating to the LNG Project as a*

whole and our evaluation of the economic feasibility of the utilization of these particular vessels in light of those developments.

(D.I. 1A, Exhibit U.) Therefore, it is undisputed that at no time prior to the instant motion had either party to the Lachmar Arbitration considered the Transportation Agreement as being terminated.

PEC now attempts to argue that the determinative factor as to the viability of the Transportation Agreement is not what the parties "thought" but instead what the parties actually brought about by operation of law. Yet contrary to PEC's labyrinthine argument as to the Transportation Agreement's "termination" and "disposition," the law to be applied is quite straightforward. Article VI, subsection (n) of the Special Provisions of the Security Agreement between Lachmar and the Government specifically provides that "the Transportation Agreement may not be amended, modified or varied without the prior written consent of the Secretary...." (D.I. 1A, Exhibit D, at 14.) Subsection (n) also provides that "no termination of the Transportation Agreement shall be effective pursuant to the provisions thereof, including [the default provisions], without the consent of the Secretary." (*Id.*) Not resting on this agreement alone, the Government obtained the very same concessions from TLC and Trunkline in their respective consents to the assignments of the Transportation and Trunkline Agreements. (*See* D.I. 1A, Exhibits E and F.) Therefore, neither Lachmar nor PEC had the power or authority to take any action to terminate, discharge or destroy Marad's security interest in the Transportation Agreement without Marad's consent, which was never forthcoming. Consequently, regardless of the ramifications of Lachmar's claims for total breach with respect to Lachmar's and TLC's respective obligations under the Transportation Agreement, the agreement continues to exist for purposes of Marad's security interest in it.

---

6. PEC admits that Marad may nonetheless have a security interest in the $135 million paid in settlement of the Lachmar Arbitration as those funds may constitute "proceeds" within the meaning of the U.C.C. However, PEC's present motion does not address that issue.

PEC's alternative argument in support of its partial summary judgment motion is that principles of *res judicata* preclude plaintiff from relitigating any claims based on TLC's breach of the Transportation Agreement. (D.I. 59 at 24–31.) This argument contends that the settlement and concomitant dismissal with prejudice of the Lachmar Arbitration was a final determination of those claims to which plaintiff should be bound. (*Id.*)

■ Under the doctrine of *res judicata,* a final judgment on the merits of an action precludes the parties or those in privity with them from relitigating those issues that were or could have been raised in that action.[7] *See Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). Thus, in order to apply *res judicata,* this Court must find: (1) that the settlement and dismissal with prejudice of the Lachmar Arbitration was a final judgment on the merits; (2) an identity of the cause of action between the Lachmar Arbitration and the present action; and (3) an identity of parties between the two actions. *See Secretary of Labor v. Fitzsimmons,* 805 F.2d 682, 688 (7th Cir.1986). In this case, PEC has failed to show the presence of all three factors, and, therefore, *res judicata* will not preclude plaintiff from asserting the claims upon which PEC has moved for summary judgment.

■ At the outset, the Court finds *res judicata* inapplicable because of insufficient identity of the causes of action. Clearly, the breaches of the Transportation

Agreement and Trunkline Agreement injured both Lachmar and Marad. Yet Lachmar's claim for damages in the Lachmar Arbitration was based solely on the breach of those agreements. On the other hand, the injury suffered by Marad, and the one for which it now brings suit, stems from the impairment of its security interest in the Transportation Agreement and all payments due thereunder. This action, therefore, is separate and distinct from Lachmar's prior arbitration action.

For example, even Count II of plaintiff's complaint (*see* D.I. 1, ¶¶ 81–92), which on its face is a contractual action for breach of the Transportation Agreement and Trunkline Agreement, is based upon Marad's status as a secured party.[8] In Count II the Government avers that TLC's and Trunkline's suspension of the Transportation and Trunkline Agreements constituted material breaches of those agreements. (*Id.* ¶ 82.) However, the claim does not end there. Instead, Count II also asserts that these breaches constituted an event which, for purposes of Article XVII of the Transportation Agreement (*see* D.I. 1A, Exhibit B at 94–96), gave Lachmar the right to terminate the Transportation Agreement. (D.I. 1 ¶ 87.) As such, Count II alleges, the breaches constituted a security default within the meaning of Article VI, subsection (i)(2)(i) of the Special Provisions of the Security Agreement. (*Id.* ¶ 88.)[9] Moreover, Count II asserts that by its dismissal of the Lachmar Arbitration, Lachmar effectively breached its obligations under the

---

7. The doctrine of *res judicata,* or "claim preclusion," should be distinguished from that of collateral estoppel, or "issue preclusion." As explained above, under *res judicata,* a judgment on the merits in one suit bars a subsequent suit which involves the same parties or their privies, and which is based upon the same cause of action. This is distinguishable from the doctrine of collateral estoppel, wherein the second action may be based upon a different cause of action and the judgment in the first suit precludes relitigation of those issues actually litigated and necessary to the outcome of the first action. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979). *See generally* 1B *Moore's Federal Practice* ¶ 0.405[1] (2d ed. 1983).

8. Count II presents the closest question as to identity of causes of action. Counts I and V are statutory actions under 46 U.S.C. § 1275(e), which allows the Government to bring suit in the event of a Title XI default. *See infra* text accompanying note 10. The remaining counts allege injuries to Marad resulting either from direct impairment of its security interest (Count XXIV), or its position as security assignee (Counts III, IV, XXII, XXIII).

9. Article VI, subsection (i)(2)(i) of the Special Provisions of the Security Agreement provides that a security default shall be constituted by: "The occurrence of any event or events which under Article XVII of the Transportation Agreement gives either party thereto the right to terminate the Transportation Agreement."

Security Agreement. (*Id.* ¶ 89.) In Count II plaintiff concludes that "Lachmar's failure to perform its contractual obligations under the Security Agreement gives [the Government] the right under section 2.14 of the Security Agreement, to sue Trunkline and TLC for their breaches of the Transportation Agreement...." (*Id.* ¶ 90.) Consequently, to suggest that the prior arbitration action of Lachmar and the present action of Marad are identical because each has its genesis in the breach of the Transportation Agreement is simply imprecise and incorrect. Rather, Marad's claims against TLC and Trunkline are based upon its standing as a secured party which is protecting its security interest; these are claims which Lachmar had no standing to assert in the prior action.

It must also be pointed out that the public interests represented by Marad in the present action are distinct from the private interests which formed the basis of Lachmar's breach claim. The Government is here representing the important public interest of ensuring continued payments to Title XI bondholders. Under 46 U.S.C. § 1275(e), in the event of a Title XI default, the Government has the right "under any guaranteed obligation or any related agreement [to] take such action against the obligor or any other parties liable thereunder that, in [its] discretion, may be required to protect the interests of the United States." 46 U.S.C. § 1275(e). *See Lachmar v. Trunkline LNG Co.*, 753 F.2d 8, 10 (2d Cir.1985). Insofar as the Government's present claim is an attempt to protect these interests, it is distinct from any claim that could have been made in the prior action.[10]

■ Because the Court finds no identity of the causes of action, it is unnecessary to address the other two factors necessary for application of *res judicata*. Nonetheless, *res judicata* is inapplicable in any event because Marad was neither a party to the Lachmar Arbitration nor in privity with Lachmar. No hard and fast rules obtain with regard to privity, which in effect "rep-

resents a legal conclusion that the relationship between [the parties] is sufficiently close to afford application of the principle of preclusion." *Southwest Airlines Co. v. Texas Intern. Airlines*, 546 F.2d 84, 95 & n. 38 (5th Cir.), *cert. denied*, 434 U.S. 832, 98 S.Ct. 117, 54 L.Ed.2d 93 (1977). Consequently, the Court must look to the relationship which existed between Marad and Lachmar.

A review of the undisputed facts clearly indicates that Lachmar did not adequately represent the interests of Marad in the Lachmar Arbitration. After PEC's June, 1985 proposal to buy out Lachmar and thereby settle Lachmar's claim, Marad made its position abundantly clear that its consent was necessary before any proposed buyout could occur. By letters dated September 20, 1985, Marad informed Pantheon, Morgas, Pelmar, TLC, Trunkline and Lachmar that "such a sale may not occur without the consent of the Maritime Administration." (D.I. 1A, Exhibit K.) By letters dated November 20, 1985, Marad again informed Pantheon, Morgas, Pelmar, TLC and Lachmar that it wanted to "reiterate that Marad's consent is required and will not be given to any proposed stock transfer or any action or transaction designed to terminate the arbitration without full protection of the Government's [security] interests." (*Id.*, Exhibit M.) The letter also made clear that Marad could not support the stock transaction as proposed unless all the parties took affirmative and effective steps to reduce Marad's risk as a secured party. (*Id.*) Thus, Marad's desire that Lachmar take steps to protect Marad's security interest was not an authorization to act on behalf of Marad. To the contrary, Marad repeatedly made clear to all parties that no such settlement could take place without its consent. Consequently, when Lachmar settled by agreeing to the buyout proposal, Marad was neither a party to that settlement nor in privity with Lachmar in its acquiescence.

---

10. In fact, Counts I and V of plaintiff's complaint are statutory actions under 46 U.S.C. § 1275(e). (*See* D.I. 1, ¶¶ 70–80, 107–14.)

For the foregoing reasons, *res judicata* does not preclude Marad from asserting the claims covered by PEC's motion.

## IV. CONCLUSION

PEC defendants have moved for partial summary judgment, as to Counts I–V and Counts XXII–XXIV of plaintiff's complaint. (D.I. 58.) PEC argues that Marad no longer has a security interest in the Transportation Agreement entered into by Lachmar and TLC, because that agreement ceased to exist when Lachmar brought and fully pursued its New York arbitration proceedings against TLC for its anticipatory breach. In addition, PEC contends that Marad's present claim is barred by *res judicata*. The Court finds both of PEC's arguments to be unpersuasive. At a minimum, the Transportation Agreement continues to exist for purposes of Marad's security interest in it. Moreover, *res judicata* is inapplicable because there is insufficient identity of the causes of action or of the parties. Consequently, PEC's motion will be denied.

An order will be entered in conformity with this Memorandum Opinion.