UNITED STATES of America, Plaintiff,

v.

PANHANDLE EASTERN CORP., Panhandle Eastern Pipe Line Co., Trunkline Gas Co., Trunkline LNG Co., General Dynamics Corp., Moore McCormack Resources, Inc., Moore McCormack LNG Transport, Inc., Morgas, Inc., Pantheon, Inc., Pelmar Co., and Lachmar, a Delaware General Partnership, Defendants.

Civ. A. No. 87–190–JLL.

United States District Court, D. Delaware.

Aug. 15, 1988.

---

Lawrence A. Hamermesh, Vicki A. Hagel and Leone L. Ciporin of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Michael Joseph, Thomas M. Dyer, E. Alex Blanton, Marie Louise Hagen, and Brett M. Esber of Dyer, Ellis, Joseph & Mills, Washington, D.C., and Robert B. Von Mehren, Louis Begley and John S. Kiernan of Debevoise & Plimpton, New York City, of counsel, for defendants Panhandle Eastern Corp., Panhandle Eastern Pipe Line Co., Trunkline Gas Co., Trunkline LNG Co., Morgas, Inc., Pantheon, Inc., Pelmar Co., and Lachmar.

Richard A. Levine of Young, Conaway, Stargatt & Taylor, Wilmington, Del., and Richard T. Franch, Robert T. Markowski, and Robert R. Stauffer of Jenner & Block, Chicago, Ill., of counsel, for defendant General Dynamics Corp.

Thomas Herlihy III of Herlihy & Wier, Wilmington, Del., and Ralph J. Savarese, Michael J. Hurley, and Thomas Horton of Howrey & Simon, Washington, D.C., of counsel, for defendants Moore McCormack Resources, Inc., and Moore McCormack LNG Transport, Inc.

## MEMORANDUM OPINION

LATCHUM, Senior District Judge.

### I. INTRODUCTION

Once again before the Court is a matter arising from a civil action in which the United States, on behalf of the Maritime Administration ("Marad"), demands monetary, declaratory and equitable relief from Panhandle Eastern Corporation ("PEC") and its affiliates,[1] General Dynamics Corporation ("General Dynamics"), Moore McCormack Resources, Inc. ("Moore McCormack"), and Moore McCormack LNG Transport, Inc. ("MMLT"). The Government has brought this suit to protect its interests as the guarantor of ship construction financing bonds which were issued pursuant to Subchapter XI of the Merchant Marine Act of 1936, 46 U.S.C.App. §§ 1271–1280 (1982).

William C. Carpenter, Jr., U.S. Atty., and Richard G. Andrews, Asst. U.S. Atty., Wilmington, Del., John R. Bolton, Asst. Atty. Gen., Dept. of Justice, Washington, D.C., Robert M. Hollis, Gregory A. Harrison, J. Christopher Kohn and Andrea Larry, Civ. Div., Dept. of Justice, Washington, D.C., and Robert J. Patton, Jr., Richard Lorr and Jay Gordon, Maritime Admin., Washington, D.C., of counsel, for plaintiff.

1. PEC is the parent company of Panhandle Eastern Pipe Line Co. ("PEPL"), Trunkline LNG Co. ("TLC"), Trunkline Gas Co. ("Trunkline"), Morgas, Inc. ("Morgas"), Pantheon, Inc. ("Pantheon"), Pelmar Co. ("Pelmar"), and Lachmar ("Lachmar").

Presently before the Court is the United States' Motion for Partial Summary Judgment Against Defendants Trunkline LNG Co. ("TLC") and Trunkline Gas Co. ("Trunkline"). (Docket Item ["D.I."] 100.) Although the Government's motion is limited to Counts I through V of its thirty-five count complaint (*see* D.I. 1, 40),[2] the Government has expressly indicated both in its briefs (*see, e.g.,* D.I. 101 at 5 n. 3), and at oral argument on this motion that it "would be made substantially whole if this motion for summary judgment were granted." (*Id.*)

Based on the undisputed material facts, and for the reasons set forth below, the Court will enter partial summary judgment for the Government.

## II. BACKGROUND

This Court has set forth much of the complicated factual background of this case in two previous memorandum opinions.[3] Nevertheless, due to the complex history of the case and the particular issues now raised, the Court will once again trace the tortuous path that has led to the Government's present motion.

In September, 1975, PEPL and Sonatrach, the Algerian National Oil and Gas Company, entered into a contract ("Sonatrach Contract") for the sale and purchase of liquefied natural gas ("LNG") for importation into the United States. (*See* D.I. 40, Exhibit W.) The Sonatrach Contract contained a "take-or-pay" clause, which required the buyer, PEPL, to purchase a minimum volume of LNG, or, in any event, to pay for that amount whether or not PEPL actually accepted delivery. (*Id.,* Article VII.) The quantities of LNG which PEPL was obligated to take could be reduced: (1) by any amount not delivered by

Sonatrach, and (2) "by reason of ... force majeure or assimilated circumstance, as defined in Article XIII [of the Sonatrach Contract]." (*Id.* ¶ 3.) Article XIII of the Sonatrach Contract was a force majeure clause which provided for temporary release from contractual obligations "in cases of force majeure or chance events affecting the facilities used for the performance of [the Sonatrach] Contract." (*Id.,* Article XIII.)

In January, 1976, PEPL assigned its interest in the Sonatrach Contract to TLC, which at the time was its indirect, wholly-owned subsidiary. (D.I. 1, ¶ 25; D.I. 6, ¶ 25.)[4] An understanding was then reached whereby Sonatrach agreed to provide three LNG tankers to transport approximately 60% of the LNG from Algeria to TLC's gasification plant in Lake Charles, Louisiana. TLC was to make its own arrangements for transporting the remaining 40% of the LNG by means of two additional tankers. (D.I. 1, ¶ 26; D.I. 6, ¶ 26.)

These additional tankers were eventually supplied by Lachmar, a partnership formed by Pelmar, Pantheon, and Morgas, which in turn were recently-created, wholly-owned subsidiaries of PEPL, General Dynamics and Moore McCormack. (D.I. 1, ¶ 29; D.I. 6, ¶ 29.) In May, 1976, Lachmar entered into a transportation contract with TLC ("Transportation Agreement") (D.I. 1A, Exhibit B), under which Lachmar agreed to provide TLC with two tankers for the transportation of LNG from Algeria to the United States. (*Id.,* Article 2.) Under the Transportation Agreement's "ship-or-pay" clause, TLC agreed to make specified, minimum annual payments to Lachmar, irrespective of the amount of LNG actually shipped on the Lachmar tankers. (*Id.,* Article 2.4.)

---

**2.** *See infra* note 5 for a summary of the claims included in Counts I through V.

**3.** *See United States v. Panhandle Eastern Corp.,* 681 F.Supp. 229 (D.Del.1988) (denial of defendants' *motion for summary judgment* as to Counts I through V); 672 F.Supp. 149 (D.Del. 1987) (denial of defendants' motion to stay pending arbitration), *appeal dismissed,* 842 F.2d 685 (3d Cir.1988).

**4.** Until 1981, TLC was a wholly-owned subsidiary of Trunkline, which in turn was a wholly-owned subsidiary of PEPL. Pelmar was also a wholly-owned subsidiary of PEPL. In the first half of 1981 PEC was formed as the corporate parent. TLC, PEPL and Pelmar then became direct, wholly-owned subsidiaries of PEC. Trunkline remained a wholly-owned subsidiary of PEPL.

Under Article 8.1 of the Transportation Agreement, force majeure with respect to TLC was defined as any event constituting force majeure and/or assimilated circumstances under Article XIII of the Sonatrach Contract. (*See id.*, Article 8.1.)

At this time, Trunkline, TLC's parent, entered into the Agreement of Trunkline Gas Company ("Trunkline Agreement"). (D.I. 1A, Exhibit C.) Under this agreement, Trunkline gave its assurance that it would "take whatever actions [would be] necessary to enable [TLC], its wholly-owned subsidiary, to perform all of its obligations under the Transportation Agreement, including the payment of all amounts due thereunder...." (*Id.* at 1.)

The cost to construct Lachmar's two LNG tankers was approximately $377.8 million. The construction costs were covered in large part by equity contributions from Lachmar's partners and by $197.5 million of ship financing bonds which were issued by Lachmar and guaranteed by Marad pursuant to Subchapter XI of the Merchant Marine Act of 1936, 46 U.S.C.App. §§ 1271–1280. As security for Marad's guarantee of the bonds, Lachmar assigned to Marad its rights under the Transportation Agreement and Trunkline Agreement. (*See* "Security Agreement," D.I. 1A, Exhibit D.) Under the terms of the Security Agreement, Marad took first and second mortgages on the two LNG tankers, as well as a security interest in Lachmar's "right, title and interest" in the Transportation Agreement between Lachmar and TLC, including all payments due thereunder. (*Id.* at 2, 3.) The Security Agreement also provided that "the Transportation Agreement [would] not be amended, modified or varied without the prior written consent of the Secretary [of Transportation] and that no termination of the Transportation Agreement [would] be effective pursuant to the provisions thereof ... without the consent of the Secretary [of Transportation]." (*Id.*, Special Provisions, Article Sixth, subsection (n), at 14.)

TLC then signed an agreement ("TLC Consent") in which it consented to this assignment to Marad of Lachmar's rights under the Transportation Agreement. (D.I. 1A, Exhibit E.) Within its consent, TLC also agreed that: "(a) The Transportation Agreement [would] not be amended, modified or varied without the prior written consent of the Secretary; and (b) No termination of the Transportation Agreement pursuant to the provisions thereof ... [would] be effective without the consent of the Secretary [of Transportation]." (*Id.*, ¶ 4, at 1–2.) Similarly, Trunkline consented to the assignment to Marad of Lachmar's rights under the Trunkline Agreement ("Trunkline Consent"), and likewise agreed not to amend, modify, vary or terminate the Trunkline Agreement without the prior written consent of the Secretary. (D.I. 1A, Exhibit F.)

As additional consideration for Marad's guarantee of the bonds, Lachmar executed several promissory notes to the Secretary in the amount of the bonds issued. (D.I. 1A, Exhibit G.)

The two Lachmar LNG tankers, the S.S. Lake Charles and S.S. Louisiana, were constructed and delivered by General Dynamics to Lachmar in 1980. (D.I. 1, ¶ 42; D.I. 6, ¶ 42.) Pursuant to its terms, the performance of obligations under the Transportation Agreement commenced on December 1, 1982. (D.I. 1, ¶ 43; D.I. 6, ¶ 43.)

During the first year of the contract the two Lachmar tankers made several trips between Algeria and Lake Charles, Louisiana. In early 1983, however, Sonatrach had agreed to reduce TLC's obligation to take LNG to 60% of the amount provided for in the Sonatrach Contract; this reduction would extend for the period of April 1, 1983 to November 30, 1984. (D.I. 1, ¶ 44; D.I. 6, ¶ 44.) TLC thereafter advised Lachmar that it would not require the services of either the S.S. Lake Charles or the S.S. Louisiana for at least twelve months. (D.I. 1, ¶¶ 45, 46; D.I. 6, ¶¶ 45, 46.) Lachmar subsequently placed both of the tankers into lay up at the Newport News Shipyard and Dry Dock Co. in Newport News, Virginia. (D.I. 1, ¶ 47; D.I. 6, ¶ 47.) On December 12, 1983, Lachmar submitted an invoice to TLC for payments due under the Transportation Agreement (D.I. 1, ¶ 48; D.I. 6,

¶ 48.) On January 13, 1984, TLC paid Lachmar $87,413,962.82. (*Id.*)

In the interim, however, in two letters dated December 12, 1983, and delivered on December 14, 1983, TLC and Trunkline informed Lachmar that they were suspending performance under the Transportation and Trunkline Agreements. (D.I. 1A, Exhibits H and I.) In its letter, TLC informed Lachmar that it was suspending future transportation under the Transportation Agreement for the reasons set forth in an attached letter which TLC and PEPL had sent to Sonatrach ("Sonatrach letter"). (D.I. 1A, Exhibit H at 1; *see id.*, Exhibit J.) The attached Sonatrach letter, also dated December 12, 1983, informed Sonatrach that TLC was suspending future purchases under the Sonatrach Contract due to "a series of exceptional and unforseeable events of a general nature, rendering the performance of the contractual obligations under the [Sonatrach] Contract and the Transportation Agreement so excessively onerous as to ensure exorbitant losses and indeed threaten the viability of Trunkline, TLC's only customer and sole source of revenue." (*Id.*, Exhibit J at 1.) The letter stated that the aforementioned events included the following:

(1) the nationwide recession, with its especially heavy effect in the market area of Trunkline and Panhandle, involving the shutting down, curtailment or relocation of industrial activities, with resultant market losses;

(2) the enactment of legislation designed to curtail gas usage and to increase by regulation and deregulation the price of old and new domestic gas supplies, which has resulted in dramatic increases in the prices of domestic gas and thus raised the market price of gas sold by Trunkline and Panhandle, while at the same time increasing the amount of gas available for sale by domestic producers;

(3) the increasingly effective energy conservation measures being taken by all classes of customers as a result of the higher gas prices;

(4) the unprecedented warm 1982–83 winter weather in the market area of Trunkline and Panhandle, which resulted in lower sales and eliminated the need to replenish storage fields;

(5) the unprecedented reduction in the prices of crude oils throughout the United States which facilitated the loss of markets to competing fuel oils; and

(6) the emergence in the Trunkline–Panhandle market area of significant competition from other sellers of gas attempting to replace lost sales in their conventional markets.

(*Id.* at 2.)

In referring to these factors in its letter to Lachmar, TLC stated:

TLC believes that the matters discussed in the [Sonatrach] letter, which were completely unforeseen by TLC and Lachmar at the time the Transportation Agreement was originally entered into and which undermine the assumptions underlying the Transportation Agreement, are equally applicable to its continued performance of the Transportation Agreement.

In light of the above, and in order to preserve the viability of the LNG project, as of this date TLC hereby suspends future transportation under the Transportation Agreement, with the obligations under the Transportation Agreement to be in suspense until such time as the economic conditions in the markets shall have improved to an extent sufficient to make performance by TLC possible without exposure to exorbitant loss.

(D.I. 1A, Exhibit H at 1.)

In response to these actions, Lachmar served a demand for arbitration in New York on TLC, Trunkline and PEC ("Lachmar Arbitration") and demanded damages in excess of $860 million under the Transportation and Trunkline Agreements. Soon afterward, Sonatrach also initiated arbitration proceedings ("Sonatrach Arbitration") in Geneva, Switzerland, claiming that PEPL and TLC breached their obligations under the Sonatrach Contract. In the Sonatrach Arbitration PEPL and TLC raised the defense of force majeure and other defenses based on Algerian law, which gov-

erned arbitration of disputes between PEPL and Sonatrach pursuant to Article XVIII of the Sonatrach Contract. (*See* D.I. 40, Exhibit W, Article XVIII.) The Lachmar Arbitration was stayed temporarily to await the results of the Sonatrach Arbitration, since the Transportation Agreement provided that a determination that a given event constituted force majeure under the Sonatrach Contract was conclusive evidence of force majeure under the Transportation Agreement. (D.I. 1A, Exhibit B, Article 8.1.)

In June, 1985, counsel for PEC delivered to Marad the outline of a proposed settlement to the Lachmar Arbitration, under which PEC would buy out the Lachmar partnership shares owned by General Dynamics and Moore McCormack. Marad responded directly to TLC by letter in September, 1985, and informed it that the proposed sale could not occur without Marad's consent. (D.I. 1A, Exhibit K.) By letters dated November 20, 1985, Marad individually informed Lachmar, TLC, Pelmar, Pantheon, and Morgas that it could not "support the stock transaction as proposed unless all the parties [took] affirmative and effective steps to reduce the Government's risk." (D.I. 1A, Exhibit M.) The letters further reiterated that "Marad's consent [was] required and [would] not be given to any proposed stock transfer or any action or transaction designed to terminate the arbitration without full protection of the Government's interests." (*Id.*)

Notwithstanding these warnings, on June 12, 1986, PEC, General Dynamics (the parent company of Pantheon), and Moore McCormack (the parent company of Morgas) came to an agreement in principle on the purchase of Lachmar. (*See* D.I. 1A, Exhibit N.) On July 20, 1986, PEC purchased all the shares of Pantheon stock from General Dynamics for $90 million, and all the shares of Morgas stock from Moore McCormack and MMLT for $45 million. (*See* D.I. 1A, Exhibits P and Q.) Simultaneously, on July 20, 1986, Lachmar and TLC signed a stipulation dismissing the Lachmar Arbitration with prejudice. (D.I. 1A, Exhibit O.) At the same time, they submitted to the arbitration panel an

"Award on Consent" which stated that "[a]t the request of all parties, this arbitration is hereby dismissed with prejudice and without costs to any party as against any other." (*Id.*) The following day PEC issued a press release which read in part: "BUYOUT OF LACHMAR ENDS ARBITRATION." (D.I. 1A, Exhibit R at 1.)

The release also indicated that Sonatrach had entered into a settlement agreement with PEPL and TLC. Under that agreement, Sonatrach received a payment of $200 million in cash and was issued six million shares of PEC common stock. (*Id.* at 2.) The settlement also suspended performance under the Sonatrach Contract. (Response of Defendants Panhandle Eastern Corporation et al. to Plaintiff's First Set of Interrogatories, D.I. 22, ¶ 37 at 11.)

In August, 1986, Marad responded to PEC's purchase of Lachmar and the concomitant dismissal of the Lachmar Arbitration with a written protest directed to PEC, General Dynamics, and Moore McCormack. (D.I. 1A, Exhibit S.) On March 10, 1987, the President of TLC delivered a letter to Marad indicating uncertainty as to how long TLC would arrange for funding to enable Lachmar to service its outstanding Title XI debt. (D.I. 1A, Exhibit U.) Within one month of receipt of that letter, the United States brought the instant action.

On November 15, 1987, Lachmar failed to make its semiannual bond payment on the S.S. Lake Charles. As the March 10 letter from TLC had indicated, no more funds were forthcoming to allow Lachmar to meet its bond obligations. On January 14, 1988, the Indenture Trustee for the Lachmar bonds demanded payment from Marad of all principal and interest due on the S.S. Lake Charles Ship Financing Bonds. (D.I. 101A, Appendix 2.) Consequently, on February 11, 1988, the United States paid out $69,265,236.11 to the Indenture Trustee on behalf of the bondholders. (*See id.*, Appendix 3.)

On March 25, 1988, Lachmar also failed to make its bond payment on the S.S. Louisiana. As a result of that default, on June 7, 1988, the Government paid out $63,717,-

000 to the bondholders. (D.I. 120A, Appendix 26.) As of July 1, 1988, therefore, the total outstanding indebtedness to Marad was $138,129,802.79, with daily interest accruing at a rate of $33,329.69. (*Id.*) However, this figure does not include the insurance expenses for the S.S. Louisiana for which Marad has not yet paid the invoice. (*Id.*)

## III. ANALYSIS

The Government has moved for partial summary judgment against TLC and Trunkline on Counts I through V of its complaint.[5] These counts are based upon the failure of TLC and Trunkline to make the "ship-or-pay" payments which accrued after their December, 1983 unilateral suspension of the Transportation and Trunkline Agreements. The Government contends that it is entitled to recover damages for the breach of those agreements, which Lachmar—with the consent of TLC and Trunkline—had assigned to it as security for Marad's guarantee of the ship financing bonds. The Government seeks damages in an amount equal to the more than $130 million that Marad has paid out to the bondholders due to Lachmar's default.

In defense of their suspension of payments, defendants have affirmatively asserted the defense of force majeure.[6] (*See* First Amended Answer, Tenth Defense,

D.I. 106.) Defendants argue that their performances under the Transportation and Trunkline Agreements were excused by conditions which, as a matter of law and within the meaning of Article 8.1 of the Transportation Agreement, made performance "commercially impractical" and constituted force majeure. More specifically, defendants assert that unforeseeable changes in economic and market conditions dramatically affected LNG prices and imposed an onerous financial burden on TLC and Trunkline, thereby threatening their viability and excusing performance. In addition, defendants contend that a force majeure condition existed because of the possibility that the United States Government would revoke defendants' gas import license.

Under Article 8.1 of the Transportation Agreement, force majeure is defined as any event which constitutes force majeure under Article XIII of the Sonatrach Contract. Thus, the Court must now determine whether conditions of economic hardship or *potential* governmental action constitute force majeure events under Article XIII of the Sonatrach Contract. Matters are further complicated, however, by defendants' contention that this Court must apply Algerian law—which governed arbitration of disputes under the Sonatrach Contract— when interpreting Article XIII of that contract.

---

**5.** Counts I through V consist of the following claims—Count I: statutory action for breach of the Transportation and Trunkline Agreements; Count II: contractual action for breach of the Transportation and Trunkline Agreements; Count III: contractual breach of assignee's rights under the assigned Transportation and Trunkline Agreements; Count IV: contractual breaches of the TLC and Trunkline Consents; Count V: statutory action for breaches of the TLC and Trunkline Consents.

**6.** Initially, the Government had asserted in its opening brief (D.I. 101) that TLC and Trunkline had exhausted all of their affirmative defenses to the breach claims set forth in Counts I through V. First, the Government had argued that of the seven affirmative defenses raised in defendants' answer (D.I. 6), only two remained: laches/statutes of limitations and venue. The Government correctly maintained that the other five affirmative defenses had been rejected by the Court in its rulings on earlier motions.

Moreover, the Government argued that these two remaining defenses were invalid as a matter of law. Secondly, the Government contended that the defendants could not now assert a defense of force majeure, because they had not affirmatively set forth that defense in their answer.

The defendants eventually moved for leave of Court to amend their answer in order to affirmatively assert the force majeure defense. (*See* D.I. 102.) The Government ultimately consented to that request and this Court granted defendants' motion to amend (*see* D.I. 105). Defendants in fact filed an amended answer which affirmatively set forth the force majeure defense (D.I. 106), thereby giving rise to the issues now before the Court. However, defendants have never contested the Government's contention that the defenses of laches/statute of limitations and venue are invalid as a matter of law. Accordingly, the Court finds that force majeure is the only affirmative defense which remains for defendants to assert.

This Court may enter summary judgment when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P. There is no dispute as to the fact that TLC and Trunkline failed to make the required payments under the Transportation and Trunkline Agreements. The only question which remains is whether, as defendants argue, the alleged conditions of commercial impracticability and governmental action as a matter of law constituted force majeure events which excused their failure to perform. As the United States Supreme Court has recently explained, "the plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). As the parties who have failed to perform their obligations and who have affirmatively asserted the defense of force majeure, defendants bear the burden of proof on this issue. *See Gulf Oil Corp. v. FERC,* 706 F.2d 444, 452 (3d Cir.1983), *cert. denied,* 464 U.S. 1038, 104 S.Ct. 698, 79 L.Ed.2d 164 (1984).

## A. *The Governing Law*

■ At the outset, the Court disagrees with the foundation of defendants' argument: namely, their contention that this Court must apply Algerian law to determine whether or not a force majeure event occurred for purposes of the Transportation Agreement.

Article 8.1 of the Transportation Agreement provides in pertinent part: "For purposes of this Transportation Agreement, the term 'Force Majeure with respect to the shipper' [i.e., TLC] shall mean ... any event ... which is defined as or constitutes Force Majeure and/or Assimilated Circumstances *under Article XIII of the Sonatrach Contract....*" (D.I. 1A, Exhibit B, Article 8.1; emphasis supplied.) This provision of the Transportation Agreement, which as a whole is governed by the law of the State of New York (*see id.,* Article 22.7), does not incorporate any other provisions of the Sonatrach Contract. Instead, Article 8.1 simply provides that those events defined as force majeure specifically within Article XIII of the Sonatrach Contract will also be force majeure for purposes of the Transportation Agreement. Furthermore, Article XVIII of the Sonatrach Contract, which is cited as authority that Algerian law governs that contract, is in fact an arbitration clause. In the clause, Sonatrach and PEPL provided that disputes arising between them should be settled by international arbitration, applying Algerian law. (D.I. 40, Exhibit W, Article XVIII.) On the other hand, the parties to the Transportation Agreement, TLC and Lachmar, expressly provided that their contract would be governed by New York law. (*See* D.I. 1A, Exhibit B, Article 22.7.) It is therefore absurd to suggest that, solely for purposes of defining force majeure events, these same parties would bind themselves to principles of Islamic law.

This conclusion is supported by the opinion of M. Cherif Bassiouni, Professor of Law at DePaul University, who testified at the Lachmar Arbitration. Professor Bassiouni testified that the Transportation Agreement "incorporated by reference only Article 13 of [the Sonatrach Contract] ..." and not any other provision of the Sonatrach Contract. (D.I. 120A, Appendix 23 at 473.) He further concluded that "when you incorporate Article 13, which is a force majeure article, in the transportation contract, you are not incorporating the entirety of Algerian law which applies to [the Sonatrach Contract].... [T]he transportation contract is subject to New York law and not to Algerian law." (*Id.*)

The Court finds this reasoning to be persuasive. TLC and Lachmar expressly provided that New York would govern the Transportation Agreement. Thus, New York law also governs that agreement's force majeure clause.

## B. *Force Majeure Under The Transportation Agreement*

■ Having determined that New York law governs the application of force maj-

eure with respect to the Transportation Agreement, the Court now turns to Article XIII of the Sonatrach Contract to establish what events fall within the definition of force majeure. Article XIII provides in pertinent part:

The contracting Parties shall be temporarily released in whole or in part, from their obligations:

—in cases of force majeure or chance events *affecting the facilities used for the performance of this Contract,* such as, in particular:

fire, flood, atmospheric disturbances, storm, tornado, earthquake, washout, landslide, lightning, epidemic, war, riot, civil war, insurrection, acts of public enemies, act of government, strike, lockout,

with the burden of proof of the force majeure character of such event falling on the Party which avails itself thereof:

—and in the following circumstances *affecting the facilities used for the performance of this Contract:*

serious accidental damage to operations or equipment affecting the Natural Gas production facilities in the field, transportation by pipeline in Algeria, treatment, liquefaction, storage, loading operations, transportation by methane tankers, unloading, storage and regasification, as well as the main exit pipe from the regasification plant to the first branching thereon, to the extent that such pipe is used exclusively for the transportation of Natural Gas purchased from the Seller and provided that the length thereof shall not exceed 47 miles; of such nature that its consequences cannot be overcome by the taking of reasonable measures at a reasonable cost;

act of a third party affecting the items specified above of such nature that such act or its consequences cannot be overcome by the taking of reasonable measures at a reasonable cost. . . .

Pending the restoration of normal conditions, the obligations of the Parties shall continue in effect insofar as their performance shall be physically possible.

(D.I. 107A, Appendix 11; emphasis supplied.)

Nowhere does Article XIII expressly state that highly adverse economic or market conditions may constitute force majeure. Rather, the clause clearly limits its applicability to occurrences which actually *affect the facilities* used for performance of the contract. Furthermore, Article XIII provides that pending restoration of normal conditions, the obligations of the parties shall continue in effect insofar as their performance is *physically possible.* Thus, Article XIII unambiguously provides for temporary release from contractual obligations only for events which affect the facilities used for performance by making performance physically impossible. This does not necessarily mean that the facilities must be physically destroyed. Thus, Article XIII contemplates such events as strikes, lockouts or epidemics, which might affect access to the facilities. However, alleged economic hardship resulting from market fluctuations is certainly not within the ambit of Article XIII. The unwillingness or inability to make monetary payments is not an event affecting the facilities in such a way as to make performance of the contract physically impossible.

Ordinarily, only when a force majeure clause specifically includes the event alleged to have prevented performance, will a party be excused from performance. *Kel Kim Corp. v. Central Markets, Inc.,* 70 N.Y.2d 900, 903, 524 N.Y.S.2d 384, 519 N.E.2d 295, 296 (1987). This maxim is especially true where the event relied upon to avoid performance is a market fluctuation. While the Court has found no New York case directly on point, American courts have routinely refused to excuse performance under such a theory, even where the force majeure clause, unlike the one in question here, presents potential ambiguities.

For example, the Fourth Circuit Court of Appeals addressed this exact question in *Langham–Hill Petroleum, Inc. v. Southern Fuels, Co.,* 813 F.2d 1327 (4th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 99, 98 L.Ed.2d 60 (1987). In *Langham–Hill,* Southern and Langham–Hill entered into a

contract under which Southern agreed to purchase a specified amount of fuel oil in four monthly installments. The contract contained a force majeure clause which left itself open to a wider range of interpretation than that which is possible under Article XIII of the Sonatrach Contract.[7] Southern purchased the first three monthly shipments as agreed. At the beginning of the following year, however, the price of crude oil in the world market collapsed as a result of Saudi Arabia's attempts to regain its share of the world oil market. Southern informed Langham–Hill that it was invoking the force majeure clause and would not perform the remainder of its obligations because of the drop in world oil prices caused by the Saudi Arabians, who were "outside Southern's control." Langham–Hill brought suit for breach of contract and the district court entered summary judgment in its favor.

On appeal, Southern argued that questions of fact existed regarding its helplessness in the face of the Saudi Arabian action and its inability to remain in business if it had satisfied its obligations under the contract. The court of appeals rejected Southern's argument and affirmed the district court's ruling. The circuit court's reasoning is particularly noteworthy:

> This court has previously expressed some opposition to efforts by a party to a contract to characterize an act which results in price fluctuations as being outside its control, thereby rendering the contract unenforceable. " 'Shortage of cash or inability to buy at a remunerative price' cannot be regarded 'as a contingency beyond the seller's control.' " *Wheeling Valley Coal Corporation v. Mead*, 186 F.2d 219 (4th Cir.1950). If fixed-price contracts can be avoided due to fluctuations in price, then the entire purpose of fixed-price contracts, which is to protect both the buyer and the seller from the risks of the market, is defeated.

813 F.2d at 1330.

The *Langham–Hill* court also relied upon the Seventh Circuit's reasoning in *Northern Indiana Pub. Serv. Co. v. Carbon County Coal Co.*, 799 F.2d 265 (7th Cir.1986), in which a utility company brought a declaratory judgment action in an effort to avoid a long-term, fixed-price coal contract. In the *Northern Indiana* case, the plaintiff electric utility, Northern Indiana Public Service Co. ("NIPSCO"), entered into a contract with the Carbon County Coal Company ("Carbon County") in 1978. Under the contract, NIPSCO agreed to buy 1.5 million tons of coal every year for a period of twenty years. The contract price of $24 per ton was subject to various escalation provisions which had driven the price up to $44 per ton by 1985. In fact, the price originally set by the contract was fixed solely on the downside, and, therefore, the contract's price provisions favored only Carbon County.

In 1983, NIPSCO had wanted to raise its rates to reflect increased fuel charges. The commission which regulated the rates issued "economy purchase orders" in which it directed NIPSCO to make a good faith effort to find and, wherever possible, to buy from utilities that would sell electricity to it at prices lower than its cost of internal generation. NIPSCO was able to do so, and, as a result, decided to stop accepting coal deliveries from Carbon County.

NIPSCO filed a declaratory judgment action in district court seeking a declaration that it was excused from its obligations under the contract, at least until the economy purchase orders ceased preventing it from passing on the costs of the contract to its ratepayers. NIPSCO argued, *inter alia*, that its performance was excused or suspended under the contract's force majeure clause or under the doctrines of frustration or impracticability. Carbon County counterclaimed for breach of contract and moved for a preliminary injunction, which the district judge granted.

On appeal, the Seventh Circuit rejected NIPSCO's force majeure argument. The

---

7. The clause in *Langham–Hill* included the following language: "If either party is rendered unable by force majeure, *or any other cause of any kind not reasonably within its control,* wholly or in part, to perform or comply with *any obligation* [of the contract] ... such obligation or condition shall be suspended. ..." 813 F.2d at 1329 n. 1 (emphasis supplied).

court of appeals pointed out that the force majeure clause permitted NIPSCO to stop taking delivery of coal "for any cause beyond [its] reasonable control ... including but not limited to ... orders or acts of civil ... authority ... which wholly or partly prevent ... the utilizing ... of the coal." 799 F.2d at 274. The court of appeals held that the force majeure clause was not triggered by the economy purchase orders, since they did not actually *prevent* the utilization of the coal. Instead, reasoned the court, the orders simply prevented NIPSCO from "shifting the burden of its improvidence or bad luck in having incorrectly forecasted its fuel needs to the backs of the hapless ratepayers." *Id.* at 275. Judge Posner's opinion further explained that NIPSCO had gambled that fuel costs would rise rather than fall over the life of the contract, and that when such a gamble fails, the result is not force majeure. The court of appeals concluded:

> A *force majeure* clause is not intended to buffer a party against the normal risks of a contract. The normal risk of a fixed price contract is that the market price will change. If it rises, the buyer gains at the expense of the seller (except insofar as escalator provisions give the seller some protection); if it falls, as here, the seller gains at the expense of the buyer. The whole purpose of a fixed price contract is to allocate risks in this way. A *force majeure* clause interpreted to excuse the buyer from the consequences of the risk he expressly assumed would nullify a central term of the contract.

(*Id.*)

This conclusion is particularly cogent with respect to "take or pay" or "ship or pay" type contracts, which expressly allocate the risk of market changes to the buyer/shipper. As one commentary has stated, "the true effect of the take-or-pay clause is to assign the risk of a deteriorating natural gas market to the pipeline." Medina, McKenzie and Daniel, *Take or Litigate: Enforcing the Plain Meaning of the Take-or-Pay Clause in Natural Gas Contracts,* 40 Ark.L.Rev. 185, 188 (1986). In the same way, TLC assumed this risk by virtue of the "ship-or-pay" provisions in its transportation contract with Lachmar.

In sum, Article XIII of the Sonatrach Contract, which defines the scope of force majeure for purposes of the Transportation Agreement, does not explicitly include economic hardship or market fluctuations in the universe of events that would constitute force majeure. Furthermore, the clause expressly limits force majeure to those events affecting the facilities used for performance of the contract. The economic and market forces cited by defendants clearly have no application under such a scheme. Finally, TLC and Lachmar included the "ship-or-pay" clause in their agreement in order to allocate risks in a certain way. To excuse defendants from performance because of the very risks they expressly assumed would nullify a central term of the Transportation Agreement. Consequently, the Court holds that economic hardship due to market fluctuations in the natural gas industry did not constitute a force majeure event for purposes of the Transportation Agreement and did not excuse defendants' performance under that agreement or the Trunkline Agreement.

Article XIII of the Sonatrach Contract does provide for suspension of obligations in the event of an act of government. Indeed, as their other force majeure defense, defendants assert that TLC's suspension of payments was justified because it was reasonable to assume at the time that formal government revocation of TLC's LNG import license was imminent. The factors alleged to have justified this assumption are set forth in the affidavit of Robert D. Hunsucker, President of PEC, as well as Chairman and Chief Executive Office of PEC, PEPL and Trunkline. (*See* D.I. 118, ¶¶ 21–25.) The Court finds it unnecessary to elaborate on these factors, however, because no such governmental action was ever taken. It is undisputed that as of the date of suspension, December 12, 1983, neither the United States Government nor the Algerian Government had revoked the import authorization, had barred defendants from importing LNG into this country, or had otherwise prevented performance of

the Transportation or Trunkline Agreements.

On March 7, 1984, the Economic Regulatory Administration ("ERA") decided to terminate, as moot, the pending proceedings involving challenges to TLC's original import license. In its May 7, 1984 order denying rehearing of the March 7 decision, the ERA concluded that "[s]hipments of the LNG were suspended as a result of TLC's market and economic conditions. This was not an action taken with the government's knowledge, involvement or interference. It was an action by a private party in response to its assessment of the economics and the demands of the marketplace." (D.I. 107A, Appendix 12 at A-37.)

In sum, no act of government ever took place to prevent TLC's performance. Consequently, the Court also finds no merit to defendants' force majeure defense on the basis of government action.

## C. *Force Majeure Under Algerian Law*

In the alternative, even assuming that Algerian law governs the issues of force majeure presented by this motion, the Court would nonetheless reach the same conclusion. Economic hardship brought on by changes in economic and market conditions is not force majeure under Algerian law, as applied to Article XIII of the Sonatrach Contract.

■ The Court notes that it may make a determination of Algerian law without conducting a trial. Under Rule 44.1, Fed.R. Civ.P., a court's determination of foreign law is treated as a ruling on a question of law rather than a question of fact. *Bassis v. Universal Line, S.A.*, 436 F.2d 64, 68 (2d Cir.1970); *Kashfi v. Phibro–Salomon, Inc.*, 628 F.Supp. 727, 737 (S.D.N.Y.1986); *Triad Fin. Est. v. Tumpane Co.*, 611 F.Supp. 157, 164 (N.D.N.Y.1985); *Fleischmann Distilling Corp. v. Distillers Co. Ltd.*, 395 F.Supp. 221, 231–32 n. 15 (S.D.N.Y.1975); *Burnett v. Trans World Airlines, Inc.*, 368 F.Supp. 1152, 1155–56 (D.N.M. 1973); *Instituto Per Lo Sviluppo Economico Dell' Italia Meridionale v. Sperti Products, Inc.*, 323 F.Supp. 630, 635 (S.D. N.Y.1971). *See generally* 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 2443–44 (1971 & Supp.1987). Thus, a question of foreign law does not obstruct the Court from disposing of a motion for summary judgment. *Burnett*, 368 F.Supp. at 1156. It is, therefore, clearly within the authority of the Court to interpret and apply any relevant Algerian statutes. *See Kashfi*, 628 F.Supp. at 737 (citing *Curtis v. Beatrice Foods Co.*, 481 F.Supp. 1275, 1285 (S.D.N.Y.), *aff'd mem.*, 633 F.2d 203 (2d Cir.1980)). In making such a ruling the Court may consider any relevant material or source, including opinion testimony by legal experts. Rule 44.1, Fed.R.Civ.P.; *Curtis*, 481 F.Supp. at 1285.

In claiming that Algerian law recognizes economic force majeure, defendants rely upon the legal opinion of Dr. Gamal Moursi Badr. In essence, Dr. Badr maintains that Article XIII must be read in light of Algerian law and that under Algerian law changes in the economy and fluctuations in the market can be considered instances of force majeure. (D.I. 114, ¶ 6 at 6, ¶ 27 at 24–25.) Furthermore, Dr. Badr asserts that Article XIII's lack of specific reference to economic conditions does not preclude the characterization of those conditions as force majeure events. (*Id.* ¶ 12.) To the contrary, Dr. Badr maintains that the events set forth in Article XIII actually broaden the scope of force majeure as it already exists under Algerian and Islamic law. (*Id.* ¶¶ 13–14 at 12–14.)

However, Dr. Badr's position is strongly contradicted by three other experts on Algerian law. For example, a directly contrary position was espoused at the Sonatrach Arbitration by Abdel Fattah Abdel–Baki, Professor of Civil Law at the University of Cairo and former Dean of the Faculty of Law and Sharia (Islamic Law) of the University of Kuwait. Dean Abdel–Baki stated that the suspension of payments could not be justified under a force majeure theory, because there was no physical or objective impossibility of performance. (D.I. 120A, Appendix 21, ¶ 42 at 13–14.) According to Dean Abdel–Baki, the obligation to pay a sum of money is always objectively possible to fulfill. (*Id.*)

This position was supported by the legal opinion given at the Sonatrach Arbitration by Antoine Kassis, a Syrian lawyer and Honorary Professor of Law at the University of Aleppo, Syria. Professor Kassis concluded that the force majeure argument formulated by the defendants was untenable under Algerian law. (*Id.*, Appendix 22, ¶ 233 at 6.) Under Algerian law, Professor Kassis asserted, the impossibility of performing an obligation to pay sums of money is inconceivable, because money is an object of a "class," which can never perish. (*Id.*, ¶ 234 at 6–7.) In other words, even if an object *within* the class is unavailable, it is always possible to supply a replacement.

At the Lachmar Arbitration, Professor Bassiouni also testified as to whether extreme financial burden may constitute force majeure under Algerian law. He testified that Article 176 of the Algerian Civil Code ("ACC")[8] is the legislative embodiment of the concept of force majeure even though it uses the term "impossibility." (D.I. 120A, Appendix 23 at 450.) Professor Bassiouni stated that "no matter how onerous the obligation ..., up to and including bankruptcy," economic hardship is not an event of force majeure under Article 176. (*Id.* at 450–51.)

Furthermore, regardless of the scope of force majeure under Article 176 of the ACC, all the experts agree that Article 178 of the ACC gives the parties the freedom to otherwise restrict that scope for purposes of their agreement. (*See, e.g.*, Badr Affidavit, D.I. 114, ¶ 12 at 11.) In Article XIII of the Sonatrach Contract the parties in fact delimited the scope of force majeure; the clause excludes any mention of economic or market conditions, and, in any event, limits force majeure to those events "affecting the facilities" needed for performance of the contract.

Despite this unambiguous language, Dr. Badr maintains that any agreement to override Article 176 of the ACC must be stated explicitly and "cannot be deduced by reference to the fact that the contract remains silent with respect to certain types of events which might arise." (D.I. 114, ¶ 12 at 11.)

Dr. Badr's contention is contradicted by the legal opinions of Dean Abdel–Baki, Professor Kassis and Professor Bassiouni. At the Sonatrach Arbitration Dean Abdel–Baki gave his opinion that "the parties can, by common agreement, diminish the rigor of the conditions of force majeure, or assimilate to it an event which does not fulfill the objective conditions required for its constitution in general." (*Id.*, Appendix 21, ¶ 29 at 12.) Dean Abdel–Baki went on to note that Article XIII in fact spoke only of force majeure affecting the facilities and did not include the events relied upon by defendants. (*Id.* at 12–13.) Similarly, Professor Kassis was of the opinion that the parties to the Sonatrach Contract "explicitly agreed ... to take account of the circumstances clearly defined and delineated as cases of exempting force majeure, to the exclusion of any other circumstance." (*Id.*, Appendix 22, ¶ 239 at 9.) *See also* Bassiouni Transcript, Appendix 23 at 450.

Professor Kassis therefore concluded that the list of cases enumerated in Article XIII is limitative, in the sense that the parties could not invoke any other event under the heading of exemptive force majeure. (*Id.*, Appendix 22, ¶¶ 241–43 at 12–14.) In reaching this conclusion, Professor Kassis looked to Article VII, ¶ 3, of the Sonatrach Contract. This provision reduced the quantities of LNG that TLC was required to purchase by the amount "not taken by reason of a case of force majeure or assimilated circumstances, *as defined in Article XIII below.*" (D.I. 40, Exhibit W, Article VII, ¶ 3; emphasis supplied.) Therefore, it is clear that the parties intended for Article XIII alone to set the limits of force majeure for the contract.

---

**8.** The following is an English translation of Article 176 of the ACC:

If performance in kind becomes impossible, the obligor is required to repair the damage suffered from the fact of the nonfulfillment of his obligation, unless it is established that the impossibility of performance arises from a cause which cannot be imputed to him. The same applies in the case of a delay in the performance of his obligation.

(D.I. 120A, Appendix 25.)

This conclusion is further supported by the contract's term conditions. Article III of the Sonatrach Contract provides for extending the term of the contract in the event that performance is suspended "pursuant to the provisions of Article XIII hereof...." (*Id.,* Article III, ¶ 2.)

Finally, Article XXIV of the Sonatrach Contract, "Revision of Contract Sales Price," indicates that the parties contemplated the possibility of market fluctuations and made explicit provisions in the event of such an occurrence. The clause provided that the parties could meet to revise the contract price by "adjusting it ... to the current economic conditions of the market" in the United States. (*Id.,* Article XXIV.) In the event that an agreement could not be reached, Article XXIV provided recourse to arbitration pursuant to Article XVIII of the contract. (*Id.*) Article XXIV is strong evidence that the parties to the Sonatrach Contract did not intend for the definition of force majeure under Article XIII to encompass market fluctuations; instead, the parties provided for this eventuality elsewhere in the contract.

Based on the foregoing factors, the Court finds the legal opinions of the Government's experts to be overwhelmingly persuasive. Consequently, the Court makes the legal determination that, under Algerian law, economic hardship due to market fluctuations in the natural gas industry did not constitute force majeure under Article XIII of the Sonatrach Contract.

The Court now addresses the final substantive question: whether potential government action is force majeure under Algerian law. Dr. Badr maintains that the question of whether or not the Government actually closed down defendants' LNG project or cancelled their permit is "patently irrelevant." (D.I. 114, ¶ 26.) The Court finds no support for this proposition. In fact, Dr. Badr simply concludes that Algerian law "does not require a contracting party to defy the *expressed will* of its national sovereign in order to perform its contractual obligations." (*Id.*) The point that has already been made above is that there was no "expressed will" of the Government. As of the date of suspension of payments, the Government had taken no action to prevent performance of the contracts. Therefore, the Court agrees with the opinion of Professor Kassis that the mere risk of future governmental action "remains at the level of speculation" and cannot constitute force majeure. (D.I. 120A, ¶ 237.)

## IV. CONCLUSION

In conclusion then, the Court has determined that neither extreme financial burden due to market conditions nor the possibility of future government action constituted force majeure under Article XIII of the Sonatrach Contract. This determination holds both under the law of American courts and under Algerian civil law. Consequently, neither of these factors can be relied upon to excuse defendants' performance pursuant to Article 8.1 of the Transportation Agreement. There being no other defense available to the defendants for their breach of the Transportation and Trunkline Agreements, the Court will enter partial summary judgment against TLC and Trunkline on Counts I through V of the complaint.

The Government has represented to the Court, both in its brief (*see* D.I. 101 at 5 n. 3) and at oral argument on this motion (D.I. 123 at 7–8), that judgment in its favor on Counts I through V would make it "substantially whole" and dispose of the other counts of its complaint. Nevertheless, the Government has failed to provide the Court with an exact dollar amount for final judgment. According to counsel for the Government, this situation results from the fact that Marad has not yet received the invoice for insurance expenses on the S.S. Louisiana. (D.I. 123 at 5.) Presumably, once this amount is tabulated, it can be added to the $138,129,802.79 owed to Marad as of July 1, 1988, on which interest is running daily at a rate of $33,329.69. (*See* D.I. 120A, Appendix 26.)

In light of this situation, the Court directs that the following steps be taken. First, the Court will enter partial summary

judgment against TLC and Trunkline on Counts I through V. Within ten days after entry of that order, the Government will file an affidavit to update the exact amount which it requests for judgment. Within ten days of the Government's filing, defendants may file opposing affidavits if they question the amount of judgment. After considering these submissions, the Court will then enter partial summary judgment in an exact amount against defendants TLC and Trunkline. If, at the time it files its affidavit, the Government moves for a Rule 54(b), Fed.R.Civ.P., certification of the partial summary judgment in an exact amount, the Court will thereafter consider that request.

An order will be entered accordingly.