436 F.2d 64
 Nikolaos BASSIS et al., Plaintiffs-Appellants,
v.
UNIVERSAL LINE, S.A., and Andreas Konstantinidis,
Defendants-Appellees, and The SS CARIBIA, her
Engines, Boilers, Tackle and
Appurtenances, Defendant-Appellee.
Fotios THEODORATOS et al., Plaintiffs-Appellants,
v.
UNIVERSAL LINE, S.A., and Andreas Konstantinidis,
Defendants-Appellees, and The SS CARIBIA, her
Engines, Boilers, Tackle and
Appurtenances, Defendant-Appellee.
 Nos. 376, 377, Dockets 35274, 35275.
 United States Court of Appeals, Second Circuit.
 Argued Oct. 26, 1970.
Decided Dec. 15, 1970.
 
 Herbert Lebovici, New York City (Lebovici & Safir, New York City, of counsel), for plaintiffs-appellants.
 John S. Rogers, New York City (Burlingham, Underwood, Wright, White & Lord, Eugene Underwood and Alexander S. Kritzalis, New York City, of counsel), for all defendants-appellees.
 Before MOORE, FRIENDLY and ADAMS,[1] Circuit Judges.
 MOORE, Circuit Judge:
 
 
 1
 The issues presented to us on appeal arise out of claims by members of the crew against the S.S. CARIBIA, formerly the famous cruise ship, 'Caronia,' which, when Cunard operated it, had carried countless world travelers to many parts of the globe. Sold to its present owner and refurbished for cruise service in Greece, she had in February 1969 sailed from New York on her first Caribbean cruise. Returning to New York on February 28, 1969, she immediately set sail (an anachronism for a power-driven vessel) for a second cruise. Less than a week later, misfortune between St. Thomas and LaGuaira in the form of ruptured steam pipes in the generator room caused electrical shortcircuits and severe damage to all generators. Temporary repairs enabled the CARIBIA to return to St. Thomas to discharge her passengers and then proceed to Puerto Rico for such repairs as enabled two of her four generators to function. She then returned to New York where she has been tied up out of service ever since. However, our attention must leave the CARIBIA and turn to the crew.
 
 
 2
 The CARIBIA is owned by a Panamanian corporation and flies the Panamanian flag. Most of the crew, some 520 in number, were hired in Greece. They signed an agreement (a 'Seaman Agreement') in the Greek language, which agreement referred to the 'Greek Collective Agreement' which governed wages, overtime and working conditions. The duration of employment was one year. Almost all of these agreements were notarized in Naples, Italy before the Panamanian Consul. In addition, crew members signed a 'Crew Roll and Agreement between Master and Seamen in the Merchant Service of the Republic of Panama' which was prescribed by the Labor Code of Panama. The law of Panama was to apply.
 
 
 3
 Returning momentarily to the ship: while she was being repaired in Puerto Rico, the crew, dissatisfied with living conditions, went on strike and demanded to be paid off and repatriated. Most of the crew were paid off and repatriated from San Juan. At that time they signed a Wages Account receipt which stated in Greek and in English, 'I received my wages up to date in full settlement, including overtime, leave allowance, etc., and have no further claim whatsoever against The Vessel, her Owners, Master or any Agents thereof.'
 
 
 4
 With the remainder of the crew, the CARIBIA returned to New York. These crew members were paid off and repatriated from New York and signed the receipt above mentioned. About thirty remained aboard. At this point, however, the misadventures of the CARIBIA, instead of ending, were, in fact, just beginning.
 
 
 5
 On May 1, 1969, a complaint was filed and a summons issued. A warrant for arrest in action in rem and a process of maritime attachment and garnishment were also issued. In the two actions (consolidated), Bassis, et al., and Theodoratos, et al., there are fourteen pages (single space) of docket entries between May 1969 and July 1970, which reveal all too well the deviousness of the Law's procedures available to skillful practitioners in their search for Truth and Justice.
 
 
 6
 The complaints brought by some ninety plaintiffs in the Bassis action and some eighty plaintiffs in the Theodoratos action were against Universal Line, S.A. and Andreas Konstantinidis (alleged owners on an 'and/or' basis) and 'The S.S. CARIBIA, Her Engines, Boilers, Tackle and Appurtenances.'
 
 
 7
 For a first Cause of Action, plaintiffs allege that they were employed to serve as seamen aboard the CARIBIA and that Articles 123-134, 150, 151, 152, 154, 166, 167, 170 and 183 of the laws of Panama and Law No. 7 of January 26, 1950, as amended (Article 2 thereof having been declared unconstitutional) were 'assimilated' to their contracts of employment. Their conclusion was that under these laws they did not receive adequate wages 'for service on Sundays and holidays, vacation pay, overtime pay for days served in lieu of a day off during each week.'
 
 
 8
 For a Second Cause of Action (withdrawn), plaintiffs claimed withheld earned wages.
 
 
 9
 For a Third Cause of Action, plaintiffs claimed that because of wages allegedly withheld in violation of 46 U.S.C.A. 596 and 597, they are entitled to penalty wages of two days for each day withheld.
 
 
 10
 For a Fourth Cause of Action, plaintiffs alleged damages because of alleged premature (short of one year) wrongful discharges.
 
 
 11
 Defendants, by answer, asserted payment and denied liability as to the Third and Fourth Causes of action.
 
 
 12
 By order to show cause, defendants moved to dismiss the Second, Third and Fourth causes of action (Rule 56, Fed.R.Civ.P.) and to release the foreign attachments against the CARIBIA (Rule Fourth causes of action (Rule 56, Fed.R. B, Supp. Fed.R.Civ.P.) and for summary judgment (Second Cause of Action withdrawn) as to the Third Cause of action because 'no wages were withheld arbitrarily, wilfully or unreasonably and, therefore, no penalties were incurred.' and as to the Fourth because 'there was no lien on the Vessel for unearned wages.' Defendants also moved for summary judgment, dismissing the wage claim on the grounds of payment according to contract and Greek law and overpayment under Panamanian law. The attachments were attacked because it was represented that Universal had officers subject to service in the Southern and Eastern Districts of New York and a place of business in the Southern District where process could have been served in personam. Voluminous affidavits as to the law and the facts supported the motion, which plaintiffs by affidavit opposed.
 
 
 13
 Virtually simultaneously plaintiff Christides moved for partial summary judgment on the First and Fourth causes of action and for an order directing sale of the vessel. This plaintiff supported his motion with an affidavit and many exhibits.
 
 
 14
 Defendants sought by way of a crossmotion to the Christides motion relief similar to that outlined above.
 
 
 15
 All motions came before Judge Dooling to whom these consolidated cases had been assigned for all purposes.
 
 
 16
 With commendable cooperation, the parties 'desirous of simplifying the issues pending before the Court for determination by it, by withdrawing from the area of consideration the computation of the amounts (depending upon which of four agreed alternatives are determined to be applicable), that would be required to be paid in the event that any of the defendants are liable to any of the plaintiffs for any of the matters in controversy,' entered into a stipulation 'as to the amounts that will be payable in the event that the Court determines that any of the defendants are liable' (Stipulation dated April 27, 1970). The parties then agreed upon the issues to be determined by the Court, namely, were the claims in the First and Fourth causes of action governed (i) by the Labor and Commercial Codes of The Republic of Panama, or (ii) by the Greek Employment Contract and the Greek Collective Agreement? Then followed a series of questions for the Court, namely, wage possibilities dependent upon the Court's resolution of the controlling law, whether or not plaintiff's discharge was justified or unjustified, the effect of the one-year hiring provision and a possible recovery under Law No. 7 of Panama. If any payments were due, they were to 'be made pursuant to the appropriate calculations that the parties have agreed to, and which are contained in Schedule A annexed hereto (the schedule containing the 'four agreed alternatives'). Thus, the case came before Judge Dooling under ideal conditions for summary judgment. As he said in his opinion (Memorandum and Order):
 
 
 17
 'Counsel by stipulation have taken a huge step toward putting the crew claims in shape for economical and early adjudication. They have agreed on a complex schedule of alternative average wage figures that are designed to cover every eventuality of decision on the legal issues. By this means the need for detailed trials of individual claims has been eliminated. Now, cross motions for summary judgment reach the dispositive legal issues presented on the first, third and fourth causes of action.'
 
 
 18
 Judge Dooling carefully considered the circumstances which caused the CARIBIA'S misfortunes, the crew's discharge and payment, the crew's wage agreements and the applicable law, which he found to be that of Panama.
 
 
 19
 Dealing with the question of unjustified discharge, Judge Dooling found that there was no indication of 'evidence that the shipowner's action constituted an unjustifiable dismissal of the men, an unjustified termination of their contracts, or an unjustified discharge of the plaintiffs from the crew.' No evidence was submitted which cast doubt upon the Court's conclusion that 'the whole adventure had been frustrated' and that the work which the crew had been hired to do 'had become impossible of performance through no fault of the shipowner.' Judge Dooling concluded that the Fourth cause of action, therefore, failed and he granted summary judgment to defendants thereon.
 
 
 20
 As to the Third cause of action based upon 46 U.S.C. 596, 597, the Court found no 'refusal or neglect to make payment without sufficient cause.' The crew had been paid and repatriated.
 
 
 21
 The Court accordingly granted defendants' motion for summary judgment dismissing the Third and Fourth causes of action and denied the motion to vacate the in rem attachment. The Court reserved decision on the motions by plaintiffs and defendants, respectively, for the sale of the vessel and the amount of security for release.
 
 
 22
 With respect to the first cause of action he ordered that the motions for summary judgment 'are granted and denied on the issues of liability and principles governing pay computation as hereinabove set forth.' Further interchanges between the parties unnecessary to detail, mainly with respect to the first cause of action, led the judge to enter a subsequent order dated July 6, 1970, on which judgment was entered adjudging that the complaints in the consolidated actions be dismissed on the merits, that plaintiffs take nothing, that Universal Line, S.A., Andreas Konstantinidis and the CARIBIA be discharged of any and all claims in connection therewith, and that the motion for an order directing the sale of the vessel be denied. From the order (June 9, 1970) and the judgment (July 6, 1970), plaintiffs appeal.
 
 
 23
 Judge Dooling's dismissal of the first cause of action rested on the basis that, although defendants had proceeded on the assumption that Greek law applied, which appellants contended and he believed to have been erroneous, the shipowners had paid the crew members more than the latter were entitled to receive under Panama law. He calculated the average payments required by Panama law to be $179.01 for overtime, $23.12 for Sundays and holidays, $23.12 for alternate day off, and $42.53 for accrued vacation pay to the date of discharge, a total of $267.78. As against this he found that the shipowners had paid an average of $484.80 under Greek law. This consisted of two main components, aside from food. The first was for gross wages actually earned; this included the nominal wage, a Sunday allowance, an 'N.A.T.' amount to gross up the nominal wage to take account of deductions for social security, a 'bonus' which really was not a bonus at all but an accepted part of the total wage under the Greek formula, and an allotment for overtime when appropriate. The second component was a severance payment equal to 45 days' gross wages as was apparently called for under Greek law.
 
 
 24
 Despite the manifest equity of the conclusion that shipowners who, under a mistake of law, had paid crewmen more than they were entitled to receive, should not be required to pay again and seek recovery against the recipients, appellants assert unjust enrichment of the crew to be mandated by Isbrandtsen Company, Inc. v. Johnson, 343 U.S. 779, 72 S.Ct. 1011, 96 L.Ed. 1294 (1952), and other authorities cited. No such mandate exists. The Johnson case held that an employer could not withhold from a seaman's wages expenditures for the medical care and hospitalization of another member of the crew attacked by Johnson, for which the Court assumed Johnson was obligated to reimburse the owner. Mr. Justice Burton's statement, 343 U.S. at 787, 72 S.Ct. at 1017, 'that only such deductions and set-offs for derelictions in the performance of his (a seaman's) duties shall be allowed against his wages as are recognized in the statutes,' means just what it says. The amount the shipowner there sought to deduct was 'for derelictions in the performance of his duties,' and the Court emphasized the problems that would be created if shipowners were allowed to set off unliquidated counterclaims as illustrated by the facts in that very case, 343 U.S. at 787-788, 72 S.Ct. at 1017. Here there was no deduction or set-off for a dereliction; rather the defendants paid the full compensation due under the law thought to be applicable, and this turned out to be more than the crew members were entitled to receive. Cf. Thomas v. Humble Oil & Refining Co., 292 F.Supp. 260, 265-266 (E.D.Va.1968), aff'd, 420 F.2d 793 (4 Cir.1970). The other authorities cited by appellants do not warrant discussion.
 
 
 25
 With the first cause of action thus properly dismissed, the third automatically fell. Whether or not a mistake with respect to the governing law would constitute 'sufficient cause' under 46 U.S.C. 596, there was no refusal or neglect to make the required payments.
 
 
 26
 With respect to the dismissal of the fourth cause of action, for unjustified discharge, we can add nothing useful to Judge Dooling's thorough discussion of Panama law. Appellants' argument that the contrary opinion of an expert automatically created an issue of fact requiring a trial completely ignores the final sentence of Fed.R.Civ.P. 44.1, added in 1966, whereby the court's determination of an issue of foreign law 'shall be treated as a ruling on a question of law.'
 
 
 27
 The parties here evinced a desire, which they fulfilled, to place before Judge Dooling all relevant facts essential to a determination of their controversy. A review of the record does not disclose genuine issues of material facts which remain to be explored. Summary judgment was the correct path for him to follow.
 
 
 28
 Appellants also claim error in an order of April 10, 1970 vacating the in personam attachment. Nothing has been shown to indicate that the Court did not properly exercise its discretion in making its order of April 10, 1970, even assuming that the failure to designate the order in the notice of appeal or lack of timeliness might not operate as a bar. In any event our affirmance of the decision on the merits renders that issue moot.
 
 
 29
 The orders of Judge Dooling dated June 9, 1970 and July 6, 1970, respectively, and the judgment dated July 6, 1970 entered on the order of July 6, 1970, are affirmed.
 
 
 
 [1]
 Of the Third Circuit, sitting by designation