**Deborah Ann GALU, Plaintiff,**

v.

**SWISSAIR: SWISS AIR TRANSPORT CO., LTD., a/k/a Swiss Air Transport Co., Ltd., d/b/a Swissair, Defendant.**

**No. 86 Civ. 5551 (RPP).**

United States District Court, S.D. New York.

April 4, 1990.

Condon & Forsyth, Michael J. Holland, New York City, for defendant.

Deborah Ann Galu, New York City, pro se.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

This is a motion by defendant and a cross-motion by a pro se plaintiff[1] for summary judgment pursuant to Federal Rule of Civil Procedure 56.

### Background

Plaintiff seeks damages based on allegations of misconduct by Swiss Air Transport Co., Ltd., (Swissair) in transporting her from Geneva to New York against her will on July 4, 1985.[2] Prior to that date, plaintiff, a citizen and native of the United States, had been working for the United

---

1. For a period of several months in 1989, plaintiff was aided by amicus curiae, Jerome J. Shestack, Esq. Mr. Shestack withdrew from the case on November 3, 1989. Plaintiff's subsequent requests that the Court "censure" Mr. Shestack are groundless.

2. This suit was originally filed in the New York State Supreme Court and removed to the United States District Court. At one time plaintiff asserted that she intended to return to her native state of California and therefore diversity jurisdiction existed. *See Galu v. Swissair*, 873 F.2d 650, 653 n. 1 (2d Cir.1989). Plaintiff now as-

Nations in Geneva, Switzerland. Plaintiff also contends that she has been a domiciliary of France since August 1983.

The uncontested events which led to plaintiff's departure from Switzerland began in early 1985 when the Daniel family of Switzerland filed criminal charges against plaintiff for harassment. On May 6, 1985, the Swiss police arrested plaintiff for allegedly harassing the Daniel family. After spending two weeks in prison, plaintiff was released because of an understanding that she would leave Switzerland. She departed Switzerland and then returned two days later to reside in Switzerland once again. Manfrini Aff. Ex. 43 (Nov. 28, 1989) [hereinafter all references to exhibits to a Manfrini affidavit are to his November 28, 1989 affidavit, unless otherwise noted]. On July 1, 1985, subsequent to her return, plaintiff obtained employment with the United Nations. On the morning of July 4, 1985, the Geneva Department of Justice and Police ordered the expulsion of plaintiff due to her "inability to adapt to the law and order established in our country." Pl. Mem. of Law, Ex. 1 (Sept. 8, 1989).

Later during the day of July 4, 1985, two female police officers, of the Canton of Geneva, purchased three tickets for a Swissair flight to New York and then forcefully placed plaintiff on board a Swissair plane bound for New York. After her arrival in New York, plaintiff again returned to Switzerland and brought actions challenging the timing of her expulsion and the validity of the expulsion order. Plaintiff also filed criminal charges against the police officers. In addition, she brought this action in the Southern District of New York seeking damages from Swissair.

On August 7, 1985, the Chancellor of State for the Canton of Geneva issued an opinion on the timing of the expulsion. That opinion affirmed the decision to carry out the expulsion immediately and held that under the circumstances plaintiff had not been entitled to a stay of the expulsion pending an appellate process. Manfrini Aff. Ex. 54. On December 17, 1985, the Swiss Federal Court affirmed the Chancellor of State's ruling. Manfrini Aff. Ex. 60.

With respect to plaintiff's criminal charges against the police officers, the Accusation Chamber ruled on October 29, 1986 that the acts of the police officers did not constitute an infraction or an abuse of authority and that the Swiss Prosecutor General had made the correct decision in dismissing the criminal charges filed by plaintiff.

With respect to plaintiff's challenge to the validity of the expulsion order, the Swiss Federal Court issued a decision on April 2, 1987 upholding the expulsion order as legally valid. Manfrini Aff. Ex. 71(b).

On July 20, 1987, the Honorable Charles S. Haight, District Judge for the Southern District of New York, dismissed plaintiff's claims in this action which related to defendant's liability for her forced removal from Switzerland. The basis for Judge Haight's decision was the act of state doctrine. At trial, plaintiff's claim that defendant was liable for events during the flight to New York City was resolved by a jury in favor of Swissair.[3]

On October 2, 1987, plaintiff filed yet another challenge to her expulsion and the manner in which it was executed. This latter action consisted of international law claims before the European Commission of Human Rights. Plaintiff claimed: (1) that

serts that she has never had an intention to remain in the United States, except to complete this litigation, and that her domicile at all times has been in France. *See* Pl.Aff. (Dec. 25, 1989). According to plaintiff, there is still federal subject matter jurisdiction under the Warsaw Convention, as well as under diversity because one named defendant, Swissair Transport Co., Ltd., is a New York corporation. *See Id.* at 5.3.

**3.** After the jury trial before Judge Haight, plaintiff filed a malpractice suit in the Southern

District of New York against her attorney, Raoul Lionel Felder, P.C. The Honorable Kevin T. Duffy has dismissed the malpractice complaint of plaintiff in its entirety. *See Galu v. Felder, P.C.,* No. 88 Civ. 3626 (Decisions of February 14, 1989 and October 5, 1989). Plaintiff has filed several motions in this action which seek relief with regard to the malpractice suit dismissed by Judge Duffy and her claims against Mr. Felder. Those motions are denied.

she was denied impartial adjudications by the Swiss justice system; (2) that the expulsion order was invalid on its face; and (3) that the expulsion order was executed with improper force. The Commission refused to grant plaintiff any relief. The first two claims were defeated on the merits and the final claim was defeated because plaintiff had failed to exhaust the issue in Swiss courts. *See* Pl. Memo. of Law, Ex. 3 (Feb. 12, 1990) [hereinafter Eur. Comm.H.R.Decision of Oct. 2, 1989].

Plaintiff also appealed the results of the trial in the Southern District of New York. On appeal, the Second Circuit affirmed the judgment in the district court "to the extent it rejects Galu's claims for actions occurring during the flight to New York City." *Galu v. Swissair*, 873 F.2d at 655. The Second Circuit, however, vacated Judge Haight's dismissal of plaintiff's "claim for forceable removal to the United States," because the record before the district court was insufficient for a determination of the scope of Swiss law and therefore the district court's application of the act of state doctrine was unsupported. *Id.* at 654. Judge Newman, writing for the Second Circuit panel, instructed this Court to determine on remand whether the act of state doctrine or Swiss law tort defenses insulate Swissair from liability.

On October 19, 1989, both parties submitted motions for summary judgment and presented oral argument. After hearing argument and reviewing the expert affidavits on Swiss law, the Court found the submissions to be inadequate for a foreign law determination. Pursuant to Federal Rule of Civil Procedure 44.1, the Court ordered each party to make a more complete presentation at a hearing. *See Twohy v. First National Bank of Chicago*, 758 F.2d 1185 (7th Cir.1985) ("appropriate for the court to demand a more 'complete presentation by counsel' on the issue" of determination of foreign law); *Bassis v. Universal Line, S.A.*, 436 F.2d 64, 68 (2d Cir.1970) (Rule 44.1 applies to determinations of foreign law on summary judgment motions). The Court also informed the parties of the subject areas which needed clarification:

(1) The precise meaning of Swiss Immigration Act Article 16, paragraph 8, which according to the Swiss Federal Court Decision of April 2, 1987:

> requires that the Canton grant the alien an appropriate period of time within which to leave Switzerland unless, on an exceptional basis, it is imperative that he or she be removed immediately.

873 F.2d at 652 (quoting Decision of April 2, 1987).

(2) An explanation of the authority of the Swiss police officers to resort to force.

(3) The nature of the proceeding which led to the Order of the Accusation Chamber on October 29, 1986, holding that Deborah Ann Galu's criminal complaint against the police officers was without merit.

(4) An explanation of the "principle of personal freedom" discussed in a Swiss Federal High Court Decision of October 2, 1984, *X v. Department of Justice of the Canton of Ticino*, and its applicability to the expulsion of plaintiff.

(5) The nature of the expulsion order and the significance of the expulsion order's fine print, which describes available appellate procedures as well as a prohibition on entering or remaining.

(6) Authority for a Swiss tort defense available to a private entity acting at the behest of local police officers.

The Court further ordered the parties to provide the complete texts of relevant Swiss legal documents as well as translations. On November 13, 1989, defendant requested an adjournment so that its expert on Swiss law could be a witness before this Court for a hearing on Swiss law. The Court granted the adjournment and added the conditions that the defendant make a copy of all submissions available to plaintiff ten days before the hearing date and provide transportation from Switzerland to New York for plaintiff's expert on Swiss law.

At the hearing on December 15, 1989, the Court heard testimony in the morning from defendant's Swiss law expert, Professor Pierre Louis Manfrini, who is a Swiss lawyer and published legal scholar. In the afternoon, Ms. Doris Leuenberger, the lawyer for plaintiff throughout her Swiss court proceedings, further elaborated on Swiss law and testified as plaintiff's expert to all disagreements she had with Professor Manfrini's descriptions of Swiss law.[4]

## Discussion

The act of state doctrine requires that "the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., International,* — U.S. —, 110 S.Ct. 701, 707, 107 L.Ed.2d 816 (1990). "Act of state issues only arise when a court *must decide*— that is, when the outcome of a case turns upon—the effect of official action by a foreign sovereign." *Id.* 110 S.Ct. at 705 (emphasis in original). The order of expulsion was an act of the sovereign, 873 F.2d at 653, and has been upheld as a lawful act by the Swiss courts. Thus, all issues going to the authority of Switzerland to expel plaintiff are beyond the scope of this Court's review due to the act of state doctrine. *See* 873 F.2d at 653 ("the expulsion order was an exercise of the sovereign power of Switzerland, precluding assessment of its validity by a United States court").[5] That includes issues as to whether plaintiff should not have been subject to expulsion as a result of her employment with the United Nations.[6]

The Second Circuit reasoned that Swissair's role in the manner in which the expulsion order was executed also can be insulated by the act of state doctrine, as long as the acts of the police officers were sovereign acts rather than the product of "wholly unratified," "*ad hoc*" decisions of the individual officers. 873 F.2d at 653–54 & n. 3. In essence, the Second Circuit held that a private party could be protected by the act of state doctrine. The recent Supreme Court decision in *W.S. Kirkpatrick, supra,* held that the act of state doctrine did not protect a private party with respect

4. Ms. Leuenberger informed the Court that although she needed an interpreter to speak, she had "no problem" understanding the English testimony of Professor Manfrini and the statements of the Court. Tr. at 66 (Dec. 15, 1989) [hereinafter all transcript references are to the December 15, 1989 hearing].

There are intimations in plaintiff's pre-hearing submissions to the Court that the interpreter hired by defendant, Ms. M. Cecile Stratta, was engaged in fraud and deceit. There is no basis for such allegations and safeguards existed to prevent the Court from being misled by an incorrect translation. At the hearing, both plaintiff and her attorney understood the French and the Stratta translations and had opportunities to make corrections. Also the Court has consulted both plaintiff's and defendant's translations of documents. Furthermore, Ms. Stratta has praiseworthy credentials, which include 17 months of service as a court appointed interpreter to the Honorable Pierre N. Leval, District Judge for the Southern District of New York. *See* Stratta Aff. (Oct. 6, 1989).

Plaintiff also makes allegations concerning the integrity of defendant's expert, Professor Manfrini. Plaintiff claims that Professor Manfrini represents state authorities in Geneva in a suit filed by Swissair "seeking, in effect, contribution or indemnity should plaintiff prevail here against Swissair." Amicus Br. at 4. Even if this allegation is true, the Court finds no reason to discredit Professor Manfrini's testimony, because of the availability of documents and the rebuttal testimony of Ms. Leuenberger for verifying the validity of his statements. In addition, Professor Manfrini answered questions under oath during the hearing, with what appeared to the Court as thoughtful, earnest responses.

Finally, the Court also finds no support for plaintiff's claims, towards the end of the hearing and thereafter, that her attorney and expert, Ms. Leuenberger, "is a secret agent of the Swiss government." Pl.Aff. (Dec. 4, 1989).

5. Plaintiff seeks to have this Court disregard this aspect of the ruling of the Second Circuit because "there was objective fraud and conspiracy in fraud between Michael J. Holland, Esquire, counsel for defendant, Swissair and the Geneva Cantonal authorities." Pl. Notice of Motion (Sept. 21, 1989). There is no basis for such allegations and they are summarily dismissed. In addition, plaintiff's motion for sanctions against the counsel for defendant are denied as without merit.

6. Plaintiff insists that the act of state doctrine is inapplicable because of corruption in the Swiss government and the inadequacy of their justice system. That argument is without merit. The act of state doctrine requires that federal courts avoid judging other governments' sovereign acts. Accordingly, the plaintiff's motions for discovery so that she can contest the validity of the expulsion order, a sovereign act, are denied.

to its own acts. The Second Circuit's ruling must be considered in the light of *W.S. Kirkpatrick*.

In *W.S. Kirkpatrick*, the defendant corporation allegedly entered into agreements resulting in bribery of Nigerian officials to obtain a construction contract from the Nigerian government. A RICO action was filed against defendant by an unsuccessful bidder, another corporation. Defendant argued that the case should be dismissed because the act of state doctrine prohibits a federal court from ruling on the validity of an act of a foreign government and a finding of bribery would "support a finding that the [Nigerian government's act of signing the] contract is invalid under Nigerian law." 110 S.Ct. at 705. A unanimous Supreme Court disagreed because "[r]egardless of what the [United States] court's factual findings may suggest as to the legality of the Nigerian contract, its legality is simply not a question to be decided in the present suit." 110 S.Ct. at 705. In other words, it was the alleged bribery and not the invalidity of the government contract that was the necessary predicate to a finding of racketeering. The invalidity of the government contract would only be a post-trial implication at best.

Applying *W.S. Kirkpatrick*, the act of state doctrine would apply in this case if:

(1) the acts of the police officers were acts of state, *and* (2) a finding of the invalidity of the acts of the police officers is a necessary predicate to a finding of misconduct by Swissair. Swissair has already been exonerated by a jury for all conduct which occurred during the flight to New York. The only actions for which defendant can be held liable at this point are those which occurred while the plane was still on the ground in Switzerland. The misconduct alleged by plaintiff is Swissair's acquiescence to the police officers' purchasing tickets, forcefully bringing plaintiff on board the plane bound for New York, and keeping her there as the plane took off for New York. In Switzerland, one cannot be held liable for acting at the behest of a police officer unless the police officer is acting unlawfully. Tr. at 80–82.[7] Accordingly, the adjudication of the propriety of the conduct of Swissair, in permitting the police officers to use force to bring plaintiff on board and keep her on board so that she could be transported to New York, depends upon a determination of the lawfulness of the police officers' conduct.

Since the lawfulness of the police officers' conduct is integral to a determination of whether or not Swissair can be held liable, then the act of state doctrine applies so long as the actions of the police were on

---

7. Plaintiff's expert agreed with Professor Manfrini that there is such a Swiss tort defense for acting at the behest of a police officer who is acting lawfully. Ms. Leuenberger responded in the affirmative to the question, "Would that action [a tort action by Ms. Galu in Switzerland against Swissair] depend on the legality of the police officers' action?" Tr. at 140.

However Ms. Leuenberger then stated that she believed that this Swiss tort defense would not apply to torts committed on board an airplane by airline employees. She contends that the authority of the commander of the plane is superior to that of a police officer aboard the plane. Tr. at 141–143. The sole legal authority for this contention is Article 11 of the Regulation of the Rights and Duties of the Commanding Officer of an Aircraft. *See* Certificate of Customary Law 23–25 (Sept. 8, 1989). Article 11 states:

1. The passengers are subject, on board, to the authority of the Commanding Officer.
2. They are obliged to comply with the instructions given to ensure the safety of the flight and to maintain discipline and order on board.

3. The Commanding Officer has the right to disembark as soon as possible a passenger who, despite warnings, does not comply with the instructions received.

*Id.* (Enclosure 8). Article 11 gives the Commanding Officer power over passengers, but it in no way stands for Ms. Leuenberger's broad proposition that "the sovereign authority of the Swiss State [can] display no effect whatsoever on board an aircraft." *Id.* at 24. Indeed, Professor Manfrini points out that the Commanding Officer could be subject to penal sanctions under Swiss Penal Code Article 286 for interfering with the lawful acts of police officers. *See* Manfrini Aff. ¶ 18 (July 27, 1989).

Finally, even if the government of Switzerland had in fact delegated its complete sovereign authority to the Commanding Officer through Article 11, then a Commanding Officer's acts under Article 11 would be acts of state pursuant to a delegation of sovereign power. Thus, the act of state doctrine would insulate the Commanding Officer under Ms. Leuenberger's interpretation of Article 11.

behalf of the state rather than actions of an independent nature. Whether the police officers' acts were sovereign acts is determinative of whether the act of state doctrine prevents a federal court from adjudicating this case on the merits.[8]

The Second Circuit set forth the following standards for determining whether the police officers performed acts of state in executing the expulsion on July 4, 1985:

> The issue ... is not whether the police officers may have slightly exceeded their authority in carrying out a decision of their government. [Here, the court added in a footnote: Actions of public officials that violate foreign law may nonetheless be insulated by the act of state doctrine so long as they are an exercise of the government's sovereign power, see *Banco de Espana v. Federal Reserve Bank*, 114 F.2d 438 (2d Cir.1940), but that is not necessarily true of unlawful actions wholly unratified by the government, see *Filartiga v. Pena–Irala*, 630 F.2d 876, 889 (2d Cir.1980); *Sharon v. Time*, 599 F.Supp. 538, 544 (S.D.N.Y. 1984).] The issue is whether the action taken against Galu in removing her to the United States was an action that had been ordered in the exercise of the sovereign authority of Switzerland, or whether it was simply an *ad hoc* decision of local police officers. The burden is on defendant to establish foreign law to the extent necessary to demonstrate its entitlement to the act of state defense. Evidence of foreign law is required not to determine whether the forceable removal of Galu was lawful but whether it was in fact an act of state.

873 F.2d at 654.

There are three aspects of the manner in which the expulsion order was carried out

that could possibly have rendered the police officers' actions "wholly unratified" and simply the product of *ad hoc* decisions: (1) the timing of the expulsion—*i.e.*, its immediate enforcement, (2) the use of force, and (3) the expulsion of plaintiff to the United States rather than to a country of her choice.

### 1. *The Timing of the Expulsion*

The police officers made plaintiff leave the country the day of the issuance of the expulsion order. The issue before this Court is whether the Swiss government authorized the police officers to refuse to grant plaintiff a longer period of time between service of the expulsion order and her departure. A brief background in Swiss immigration and administrative law is necessary to resolve this issue.

Both experts agreed that plaintiff was subject to an administrative expulsion which is governed by both Swiss law on administrative procedure and Swiss immigration law. Article 39 of the Administrative Procedure Code provides for immediate enforcement of a decision "when any suspensive effect to a potential recourse against that decision has been withdrawn" by the authority who made the decision. Tr. at 31.

The documents show that the Geneva Department of Justice and Police authorized that the expulsion order be enforced immediately rather than after a period of "suspensive effect." On the expulsion order directed to plaintiff the Department crossed out the sentence "An appeal shall stay execution." Manfrini Aff.Ex. 44.[9] In addition, the order stated, "Il lui est enjoint

---

**8.** The Second Circuit's opinion in *Galu v. Swissair*, 873 F.2d at 654–55, instructed this Court to determine whether either the act of state doctrine or a Swiss tort defense insulates Swissair from liability. Swissair does potentially have available to it the Swiss tort defense of acting at the behest of a police officer who is acting lawfully. However, if the police were performing acts of state, then this Court cannot determine whether that tort defense applies. Such a determination is prohibited by the act of state doctrine because it would require this Court to

judge whether the acts of the police—acts of the state—were lawful. Accordingly, a holding that the act of state doctrine is applicable prevents this Court from addressing whether the Swiss tort defense is applicable.

**9.** Plaintiff also has raised issues concerning the authenticity of the expulsion order documents. Apparently plaintiff is in possession of a carbon copy of the original expulsion order, now on file at the Department of Justice of the Canton of Geneva. Defendant and defendant's expert have

d'avoir a quitter la Suisse des la notification de la presente decision." This translates as "It is imperative for her to leave Switzerland upon notification of this decision." Thus, enforcement of the decision is "upon notification." Manfrini Aff.Ex. 44; Pl.Memo. of Law, Ex. 1 (Sept. 6, 1989). Plaintiff argues that defendant incorrectly translates "notification" as "immediately upon receipt of service." Plaintiff contends that the term "notification" implies "after exhaustion of an appellate process."

There appears no doubt to the Court that the effect of the sentence is an instruction of immediate enforcement. Professor Manfrini explained, with the aid of a comparison with samples of expulsion orders in which immediate enforcement is not required, *see* Manfrini Aff.Ex. 91–92, that when authorities want to stay the effect of an expulsion order, then the phrase "des la notification de la presente decision" (upon 'notification' of this decision) is crossed out and replaced by a clause specifying the amount of time for which the order's effect will be stayed. Tr. at 41–43. On the sample orders provided by defendant, the Cantonal authorities crossed out "des la notification de la presente decision" and wrote in

a clause specifying conditions like "30 days from 'notification' of this decision" and "as soon as her husband is released from prison." Tr. at 41–42. Furthermore, Ms. Leuenberger agreed with Professor Manfrini's explanation. Tr. at 124.

The Decision of August 7, 1985 of the Chancellor of the State of Geneva supports Professor Manfrini's opinion that the expulsion order authorized immediate execution by the police officers. Plaintiff's Swiss attorney concedes that plaintiff directly challenged the immediate enforcement of the expulsion order in a proceeding in Switzerland. Tr. at 85. The Chancellor concluded:

> [T]aking into account the obstinate repetition of her acts disturbing the tranquility of the family concerned, as well as the peace, it has to be admitted that immediate execution of the expulsion decision at issue was imperative, notwithstanding appeal.

Manfrini Aff.Ex. 54. That decision was affirmed on appeal by the Swiss Federal Court Decision of December 17, 1985. Manfrini Aff.Ex. 60.[10]

submitted and relied on copies of the original document as it appears on file in Geneva. On the original, a series of typed X's crossed out the sentence, "An appeal stays execution." On plaintiff's copy the series of typed X's appear slightly below the sentence. This is apparently only a result of the copy being improperly aligned beneath the carbon paper. Another problem is that only the Geneva original document bears the stamp of the police. This is also simply a product of defendant using the original and plaintiff using the carbon copy.

The final authenticity issue is that on this motion defendants have produced a "second page" to the expulsion order containing the signature of the police chief and the notation "execution thereof to be assured without delay." Plaintiff contends that defendant did not present the "second page" before Judge Haight or the Second Circuit and that its sudden appearance is evidence of an act of fraud on the Court. Professor Manfrini has clarified that the so called "second page" is not part of the actual expulsion order, but merely a transmittal form. Tr. at 57–58. The Court finds that the issues in this case can be resolved without reference to this "second page" and therefore there is no need to debate whether it can now become part of the record. There is no evidence that defen-

dant has acted fraudulently in providing this "second page" at this juncture in the litigation.

The Court accepts Professor Manfrini's sworn, live testimony that he examined the original expulsion order document in the files in Geneva and that a true copy of the original document is Exhibit 44 to his affidavit. Tr. at 55.

10. The Second Circuit noted that the Swiss Federal Court Decision of April 2, 1987, stated:

> [T]here might certainly be reason to doubt that the Cantonal authority respected all of appellants rights, in particular, Article 16, par. 8 RSEE which requires the Canton to grant the alien an appropriate period of time within which to leave Switzerland unless, on an exceptional basis, it is imperative that he or she be removed immediately.

873 F.2d at 652 (quoting Swiss Decision). However, this statement was only *dictum* in an opinion on the validity of the expulsion order. The issue on the immediate execution of the order was addressed in a different decision on August 7, 1985 and was not before the Swiss court in the April 2, 1987 decision. *See* Tr. 71–75. The European Commission on Human Rights has reached the same conclusion on the insignificance of that sentence in the April 2, 1987 decision. *See* Eur.Comm.H.R. Decision of Oct. 2, 1989.

The evidence of foreign law further shows that the Geneva Department of Justice was lawfully authorized to make its determination that plaintiff's expulsion order was of an "exceptional" nature and therefore required immediate enforcement. Tr. at 33. Both the Administrative Procedure Code and the federal Immigration Act authorize the Department of Justice to decide that immediate enforcement may be appropriate. Tr. at 35–38 (discussing Article 16 ¶ 8 and Article 14 ¶ 1 of the Immigration Act).[11] The evidence is conclusive that the police officers acted pursuant to their superiors' decision, on behalf of the government, that plaintiff's expulsion was what Article 16 ¶ 8 describes an "exception [when] immediate removal is imperative."

### 2. The Use of Force by the Police Officers

Plaintiff alleges that on July 4, 1985 the female police officers forcibly detained plaintiff, forcibly placed her on a Swissair plane and forcibly kept her on the plane. She further alleges that these acts were implemented against her will. After the expulsion, plaintiff returned to Switzerland to file criminal charges against the police

officers for unlawfully engaging in force against her on July 4, 1985. Manfrini Aff.Ex. 72. Plaintiff charged the police with abuse of authority and unlawful "constrainte" (meaning either coercion or constraint). Manfrini Aff.Ex. 85 and Galu Aff.Ex. 5 (Sept. 6, 1989).

The Geneva Prosecutor General conducted an investigation pursuant to plaintiff's complaint and dismissed the complaint as without merit. Plaintiff then appealed the refusal to prosecute to the Accusation Chamber, a Swiss judicial body. Ms. Leuenberger submitted legal memoranda and evidence to the Accusation Chamber. In addition, a hearing was held.

The Accusation Chamber first held that there could be no criminal wrongdoing on the part of the authorities who issued the expulsion order because the officials did not intend to cause harm to plaintiff. Manfrini Aff.Ex. 85; Galu Aff.Ex. 5 (Sept. 6, 1989). The Accusation Chamber decision then addressed the charges against the police officers. The decision recited the facts of the encounter between plaintiff and the police officers:

---

11. Article 14, ¶ 1 now explicitly authorizes immediate ejection without appeal: "The alien ... whose eviction or expulsion should undergo no delay can be ejected on order of the competent cantonal authority." Manfrini Aff.Ex. 93. At the time of plaintiff's expulsion, Article 14 ¶ 1 stated: "If the foreigner does not comply with the expulsion order, he may be ejected." Tr. 122. Plaintiff stated during oral argument that under Article 14 at the time of her expulsion, even if the stay of execution was suspended, the Canton still could not engage in immediate enforcement of the order until a separate written document was issued. The testimony of Ms. Leuenberger, however, is that such immediate enforcement could have lawfully occurred at the time of plaintiff's expulsion in the event that plaintiff posed an imminent threat to Swiss society. Tr. 126, 129. The Swiss justice system has definitively resolved that plaintiff did pose such an exceptional danger which required immediate enforcement on July 4, 1985. See Decision of August 7, 1985 (Manfrini Aff.Ex. 54), aff'd, Decision of December 17, 1985 (Manfrini Aff.Ex. 60). Those decisions show that the revision of Article 14 after plaintiff's expulsion was simply a codification of Swiss practice as it existed at the time of plaintiff's expulsion.

Plaintiff also cites the Council of State's Brief, entitled "Observations," to support the argument that there should have been a second, separate

order before the police could enforce the expulsion decree. See Pl. Supplemental Memo. at 3 (Sept. 11, 1989). Plaintiff has misread the difference between the expulsion order of July 4, 1985 and the refoulement order issued upon her quick return to Geneva on July 15, 1985. See Pl. Supplemental Memo., Ex. 4 (Sept. 11, 1989). When plaintiff returned to Switzerland the police ejected her immediately via "a 'refoulement' (ousting) measure pursuant to an expulsion." Id. Plaintiff contends that a refoulement measure was also needed before the original expulsion could be executed. That is not true. The July 4, 1985 expulsion was pursuant to an administrative determination, whereas the July 15, 1985 refoulement was an order to enforce the original expulsion order. A second administrative expulsion order was not necessary to immediately expel plaintiff after she had reentered in violation of the original expulsion order. The refoulement measure functioned as a means for expelling plaintiff without going through the entire administrative process of drawing up a new expulsion order. An expulsion order itself can be immediately enforceable, as described above, and it would be redundant for an immediately enforceable expulsion order to need an accompanying refoulement order to be able to be executed.

[T]he mission with which they [the police] were charged was not a peaceful one, this [is] because of the recalcitrant behavior of Deborah Ann GALU. Thus, one cannot see how the policewomen would have carried out this mission without entering into conflict with the appellant who physically opposed the principle of her expulsion.

Galu Aff.Ex. 5 (Sept. 6, 1989). The Accusation Chamber then held that the acts of the police officers fell within the province of Article 32 of the Swiss Criminal Code which provides: "An act ordered by law or falling within the official or professional duties does not constitute a violation." *Id.;* Tr. at 24.[12] The same grounds which justify the determination by the Swiss court that the acts of force were within the scope of Article 32 also suffice to justify a determination that the acts of force are insulated by the act of state doctrine. *Compare Filartiga,* 630 F.2d at 889 (doubting that act of state doctrine insulates acts of torture committed by a state official in violation of Paraguayan law and "wholly" without ratification by Paraguayan government).

The evidence of foreign law presented at the hearing further supports the conclusion that the acts of the police towards plaintiff on July 4, 1985 were acts of the state. The Cantonal Police Statute Article 3(e) leaves alien law enforcement within authority of police officers. Manfrini Aff.Ex. 86. The federal and cantonal law delegates to police officers the power to use direct force to execute enforceable administrative decisions, Tr. at 33, 59; and, as discussed above, the expulsion order was immediately enforceable.

As the Second Circuit explained, the use of force by the police officers would have to have been *ad hoc* to be beyond the protection of the act of state doctrine. Professor Manfrini explained that under Swiss law police officers only engage in independent acts when they act pursuant to an order which appears on its face to be null and void. Since the Swiss courts have upheld the expulsion order as valid as to both its withdrawal of suspensive effect and its underlying merit, the use of force by the officers was, under Swiss law, not an independent act but an act of state.[13] The act of state doctrine thus bars this Court from scrutinizing the use of force by these policewomen acting in their official capacity as provided by Swiss law pursuant to the authorization of a foreign sovereign.

3. *Denial of Plaintiff's Choice of Destination*

The police officers forced plaintiff to board a plane bound for the United States, even though plaintiff claims to have stated that she preferred to go to Ferney–Voltaire, France, where she apparently had a residence as well as in Paris. There is no codified Swiss law which directly addresses a right to be expelled to a nation of one's choice. The only definite restriction is that one cannot be expelled to a nation where one will not be admitted.

Professor Manfrini explained the practice of the Canton of Geneva:

They eject or they implement an expulsion order by ejecting the foreigner towards his or her native country except in a situation where the foreigner is able to establish that it has a right of residence in a third country. This being said, in certain circumstances whereby the ejec-

---

**12.** Plaintiff points out that the Accusation Chamber expressly did not address the issue of whether plaintiff was entitled to immunity from expulsion by virtue of her employment with the United Nations. That issue, however, was addressed and found to be without merit in the decisions of the Swiss Courts upholding the validity of the expulsion order. *See* Manfrini Aff., Ex. 71, 71(b) (translating texts of Decisions of Oct. 17, 1986 and April 2, 1987).

**13.** Plaintiff's Swiss attorney testified that plaintiff had unsuccessfully contested the use of

force issue in the Swiss Courts in a civil forum; however, no written opinion on the matter was issued. Tr. at 87–88.

Plaintiff also contends that an individual has a right under Swiss law to refuse to cooperate with a "patently defective" order. This argument fails, as does her argument that police enforcement of the order was an independent act, because the expulsion order was valid and enforceable immediately and thus not "patently defective."

tion is motivated by important public policy elements, although the foreigner is able to establish that he had the right of residence in the third country—.... In that circumstance [when "important public policy elements" are at stake,] the immigration authorities still eject the individual to his native country for the following reason: They don't want by ejecting a foreigner to the immediate border—and Switzerland and Geneva is surrounded by France— ... to run the risk that the individual comes back within the next two hours. Therefore, all I am saying is that it really depends on the circumstances and one cannot set up a rule saying there is a choice of destination in any circumstance and in any type of expulsion order.

Tr. at 48–49. Professor Manfrini maintains that an administrative decision to expel plaintiff to her native country rather than to France was made pursuant to Swiss law and procedures because there was a fear that plaintiff would return due to her opposition to her expulsion, Manfrini Aff.Ex. 54 and 85, her recent reentry after her post-arrest departure in May, Manfrini Aff.Ex. 43, and the ease with which she could reenter from her home in the border town of Ferney–Voltaire. Tr. at 45–53.

Plaintiff responds by contending that the denial of plaintiff's request to go to Ferney–Voltaire was an unauthorized act. Plaintiff relies on a Decision of October 2, 1984 of the Swiss Supreme Court of Appeal in the matter of *X v. Department of Justice of the Canton of Ticino.* Manfrini Aff.Ex. 107. In that case, the Swiss court held that a convict, subject to judicial expulsion as part of his sentence, was entitled to be expelled to the country of his choice. The convict did not oppose his expulsion and claimed that "the Swiss public interest" would be satisfied regardless of the country to which he went. *Id.* The Swiss

court agreed with the convict's claim because "the principle of personal freedom cannot be restricted more than is absolutely necessary." *Id.* The Swiss Court concluded that a right to expulsion to the country of one's choice "can be limited only by serious considerations of law and order." *Id.*

Professor Manfrini maintains that the *X v. Department of Justice* decision is inapplicable because it dealt with an issue of criminal sentencing which is not relative to plaintiff's *administrative* expulsion. Neither party has presented a similar holding pertaining to the realm of *administrative* expulsion or where the party opposes any expulsion at all. Although *X v. Department of Justice* may present a different type of expulsion, plaintiff's expert points out that the principle of personal freedom served as the basis for the decision and that principle should also apply in administrative expulsions.

The Court is persuaded by Professor Manfrini's second argument that even if *X v. Department of Justice* were a proper precedent, the case of Deborah Ann Galu does not require the same result. As noted in *X v. Department of Justice,* the personal freedom interest in choosing one's destination is not absolute.[14] Serious considerations of public interest outweighed any personal freedom interests of plaintiff in not being expelled to the French border. The determination that the public interest required the immediate expulsion of plaintiff and her relentless opposition to that expulsion also justified sending her to the United States rather than France. *See* Tr. at 45–53. Such public interests were not present in *X v. Department of Justice,* where X consented to his expulsion and there was no indication that X would want to reenter Switzerland.[15]

14. The right to personal freedom derives from unwritten Swiss constitutional principles and the International Convention for the Protection of Human Rights and Fundamental Freedoms. Under Swiss law the right can be limited in circumstances of public exigency. Under the International Convention Article 5(1)(f) it can be limited in the context of "action being taken

with a view to deportation or extradition." Tr. at 70; Leuenberger Aff.Ex. 3 (Sept. 8, 1989). *See* Eur.Comm.H.R. Decision of Oct. 2, 1989 (explaining how Article 5(1)(f) permits limitations on plaintiff's liberty interests in execution of expulsion)).

15. Plaintiff's Swiss attorney conceded that she brought an action in the Swiss Courts to "con-

Standard government practice and Swiss legal principles show that the Swiss government was the authority not only for plaintiff's immediate expulsion, but also for the acts of the police in directing plaintiff to her native country rather than to France. Accordingly, the act of state doctrine also insulates Swissair from liability for its failure to refuse to cooperate with the Swiss authorities' decision to expel plaintiff to the United States rather than her country of choice, France.[16]

### Conclusion

Both parties have cooperated with the Court in an admirable fashion in apprising the Court of applicable Swiss law through the presentation of live expert testimony, expert affidavits, and translations of statutes, court decisions and orders.[17] Indeed, the pro se plaintiff, a highly intelligent and resourceful person, conducted the hearing in accordance with the rules of procedure without need for a correction but for a few instances.

A determination of foreign law is an issue of law. *See* F.R.C.P. 44.1; *Bassis v. Universal Line, S.A., supra; Instituto Per Lo Sviluppo Economico Dell' Italia Meridionale v. Sperti Products, Inc.,* 323 F.Supp. 630, 635 (S.D.N.Y.1971). The foreign law presentations demonstrate conclusively that the manner in which the expulsion order was carried out constituted lawfully authorized government practice and

was not the product of *ad hoc* or "wholly unratified" police activity. Accordingly, the act of state doctrine insulates the role of Swissair in the execution of the expulsion of plaintiff. Defendant's motion for summary judgment is granted in its entirety and plaintiff's cross-motion for summary judgment is denied in its entirety.

IT IS SO ORDERED.

---

test the fact that they were able to convey Ms. Galu to the United States." Tr. 87. The Swiss justice system denied relief on this issue without issuing an opinion.

Plaintiff also cites to the Council of State's Brief, entitled "Observations," to support the contentions that there is an absolute right to choice of destination. *See* Pl. Supplemental Memo. Ex. 4 (Sept. 11, 1989). The Observations' do not support that contention. The basis of its statement that there is a right to choice of destination is a publication which relies entirely upon the case of *X v. Dept. of Justice,* the effect of which is discussed at length above.

**16.** Swissair also argues that Swiss contract principles obliged it to transport plaintiff because a ticket had been purchased on her behalf. Plaintiff responds with different interpretations of Swiss contract law. Since the law of Switzerland is clear in other areas which are dispositive of this motion, the Court need not enter the

muddy waters of Swiss contract law to decide the motion.

**17.** Plaintiff has requested that the Court postpone decision on the summary judgment motions until defendant produces translations of portions of two Swiss law commentaries, a statute and the "exhibits to the Geneva Council of State's 'Observations' [Brief] to the Swiss Federal Court." Pl. Motion for Production of Documents (March 4, 1990). The requested translations pertain to authorities relied upon by the Swiss Federal Court Decision of April 2, 1987 upholding the validity of the expulsion order. The Court has a translation of that Decision, which is not subject to review by this Court, and the Court defers to that Decision's discussion of these documents. The Court denies plaintiff's request for additional translations because the extensive submissions and expert testimony have provided an adequate presentation of pertinent Swiss law.